Argued and submitted November 16, 2010, affirmed June 15, 2011

Janet FITTS
and Robert Harris,
*Plaintiffs-Appellants,*

*v.*

William CASE,
*Defendant-Respondent.*

Linn County Circuit Court
073045; A142158

267 P3d 160

Justin Wirth argued the cause for appellants. With him on the briefs was Jeanne Smith & Associates, PC.

George B. Heilig argued the cause for respondent. With him on the brief was Heilig Misfeldt & Armstrong, LLP.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Rosenblum, Senior Judge.

ROSENBLUM, S. J.

**ROSENBLUM, S. J.**

Plaintiffs, Janet Fitts and her brother, Robert Harris, appeal from a judgment declaring that defendant is the owner, based on adverse possession, of a 2.5-acre strip of land located in Linn County. On appeal, plaintiffs' assignments of error primarily challenge the sufficiency of defendant's evidence that his use of the disputed property was "hostile." On *de novo* review, ORS 19.415(3) (2007),[1] we affirm.

The disputed property subject to this appeal is a 2.5-acre, roughly triangular, southeast segment of a 40-acre parcel that is recorded by deed as "Parcel I." The North Santiam River runs in a north to southwesterly direction through the southeastern corner of Parcel I, thus creating a natural boundary between the majority of the parcel and the disputed property. The river divides the parcel along county lines so that the majority of it is on the west side of the river, in Marion County, and the disputed property located on the southeast side of the river, is in Linn County. The ultimate issue in this case is whether the owners of farmland that abuts the disputed property—defendant and his predecessors in interest—established adverse possession through their farming activities up to the banks of the river, *i.e.*, throughout the disputed property.

Plaintiffs' parents, Dallas and Jean Harris, purchased Parcel I in 1975 from Leo Weddle, who had farmed the land until that time. From 1975 until the end of his life, Dallas farmed Parcel I up to the west bank of the river. It is not clear from the record when Dallas passed away; however Jean Harris, who apparently outlived her husband, died in 1994. Title in Parcel I passed from Jean's estate to the Harrises's children, plaintiffs Janet Fitts and Robert Harris, in 1998. Since 1998, plaintiffs have not made any use of the disputed portion of Parcel I, but have been paying taxes on that property.

---

[1] A 2009 amendment to ORS 19.415(3) made *de novo* review in most equity cases discretionary. *See* Or Laws 2009, ch 231, § 2. Because the notice of appeal in this case was filed before the effective date of the amendment, we apply the 2007 version, under which *de novo* review is required.

Defendant owns roughly 628 acres of land known as the Mitchell farm. The Mitchell farm surrounds the disputed property to the east and to the south, such that the disputed property is situated between the Mitchell farm and the southeast bank of the North Santiam River. There are no artificial or natural boundaries separating the disputed property from the Mitchell farm, which Harvey and Ethel Mitchell owned and operated from 1930 until 1968. Along with their son Mike, who lived on the family farm from 1930 to 1951 and from 1952 to 1968, the Mitchells utilized the disputed property as if it were part of their farm. Their use of the disputed property changed throughout the years, but for the most part included a combination of pasturing livestock and cultivating hay or row crops. The Mitchells sold their property to Jim Towery in 1968, and he continued to use the farm and the disputed property in the same manner as the Mitchell family.

In 1994, defendant purchased the Mitchell farm from Towery and continued to utilize it in a similar manner to the Mitchells. Defendant cultivated two acres of the disputed property and used the remaining half-acre, where animal sheds had previously been constructed, as a seasonal recreation area. Defendant added improvements to the recreation area over the years, including stringing up lights that ran on a generator and adding a concrete block fire pit.

The present dispute arose in 2007, when defendant filed a planning and zoning application to build an accessory farm dwelling on the Mitchell farm. After plaintiff Fitts received notice of that application, she arranged a meeting with defendant, during which Fitts told defendant that she wanted him to begin paying rent for use of the disputed property. According to defendant, that 2007 meeting with Fitts was the first time that he had been made aware of a claim of ownership of the disputed property by plaintiffs. Fitts and defendant did not come to an agreement at that meeting. Later, defendant contacted Fitts to inform her that he believed that he had acquired the property through adverse possession, and plaintiffs ultimately filed this action for ejectment. Defendant counterclaimed, asserting ownership by common-law adverse possession, statutory adverse possession, ORS 105.620, and title by accretion, and seeking to quiet title in himself.

The trial took place in 2009. Including defendant, four witnesses testified in support of defendant's claim for adverse possession. Mike Mitchell testified that, growing up on the Mitchell farm until 1951, he had always believed that his parents were the owners of all the farmland up to the east bank of the North Santiam River, including the disputed property, and that he had helped his parents cultivate crops and pasture livestock along the river. Mike further testified that, after returning from a two-year stint in the military in 1952, he personally observed his father, Harvey Mitchell, continue to farm the disputed property in the same manner that he had when Mike was a child until the property was sold to Towery in 1968.

Steve Helms, Sr., who has lived and worked on the farm adjacent to and southeast of defendant's since 1944, also testified. Helms Sr. has visited the Mitchell farm on a regular basis to hunt or to visit with the owners of that property. Helms Sr. testified that, from 1950 until the Mitchells sold the land to Towery in 1968, he had observed the Mitchells farming and, in particular, pasturing livestock "clear down to the river and back. Always." Helms Sr. testified that he had always believed that the Mitchells farmed only the land that they had owned and that, since the Mitchells sold the farm in 1968, he has observed each of the farm's successive owners utilizing the whole farm in the same manner as the Mitchells had. Finally, Helms Sr. testified that he had known Dallas Harris, plaintiffs' predecessor in interest, during Harris's lifetime and that he had observed Harris farming only on the north side of the North Santiam River.

Steve Helms, Jr., who has lived and worked with his father on the Helms farm his entire life, testified that he had also observed the Mitchells and Towery farming the disputed property during the time that they each owned the Mitchell farm. Helms Jr. testified that, since the late 1960s, when he was eight or nine years old, he would regularly visit the disputed property to ride horses, pick mushrooms, and hunt deer and ducks. During those visits, which continued throughout his childhood, Helms Jr. would observe the Mitchells pasturing livestock and growing crops on that land up to and adjacent to the river. Based on those observations,

Helms Jr. testified that he always thought the disputed property was part of the Mitchell farm. Helms Jr. has continued to visit the Mitchell farm since defendant bought it, and he testified that defendant has also continued to use the disputed property in a manner consistent with the prior owners.

Finally, defendant testified that, while growing up nearby, he had also regularly visited the Mitchell farm and had always believed that the disputed property was part of that farm. It is not indicated in the record whether defendant looked at the deed when he began purchasing the property in 1994; however, defendant testified that, when he bought the Mitchell farm from Towery, he believed that his purchase included the land up to the banks of the river and, thus, the disputed property. He testified that that belief was based on his childhood observations and on what Towery had shown him to be the property that he was buying.

Plaintiffs' case regarding defendant's adverse possession claim consisted of two surveys and a deed showing the disputed property to be part of plaintiffs' land, a surveyor's testimony that Towery had ordered a survey in 1988 showing that the disputed property was not part of the Mitchell farm, and testimony by plaintiff Fitts.[2] Fitts testified that she believed that her predecessor (her mother) had logged the disputed property in 1993, based on personal knowledge that her mother had been logging Parcel I during that time and on her observations of logging trucks on the other side of the river. Fitts also testified that, contrary to defendant's testimony that he had never spoken to her about the property before their 2007 meeting, she had twice given defendant permission to farm the disputed property, once during a chance meeting at a Costco in 1998 and again at a similar chance meeting in a restaurant in 2003.

---

[2] At trial, the court sustained an objection to plaintiffs' attempt to introduce additional testimony by the surveyor that Towery had told the surveyor that he did not own the disputed property. Plaintiffs argue on appeal that that testimony was admissible as a nonhearsay admission by a party opponent under OEC 801(4)(b). That is so, plaintiffs claim, because "as to real property, a statement of a former owner in the nature of an admission against interest is admissible against his or her successors in title." Plaintiffs cite no Oregon authority supporting that proposition, nor are we aware of any. We reject plaintiffs' argument without further discussion.

After hearing the evidence, the trial court ruled in defendant's favor on the adverse possession claims, thus dismissing plaintiffs' ejectment claim and entering judgment quieting title to defendant. This appeal by plaintiffs followed.

Adverse possession is governed in Oregon by both common law and statute. To succeed on a claim of common-law adverse possession, a claimant must prove by clear and convincing evidence that he or his predecessors in interest made use of the property that was actual, open, notorious, exclusive, continuous, and hostile for a 10-year period. *Lieberfreund v. Gregory*, 206 Or App 484, 490, 136 P3d 1207 (2006). Proof that a predecessor in interest adversely possessed the property for the statutory period is sufficient if there is evidence that the predecessor intended to transfer whatever adverse possessory rights he or she may have acquired. *Id.* at 490 n 5 (citing *Timber Service Co. v. Ellis*, 163 Or App 349, 353-54, 988 P2d 396 (1999)). ORS 105.620, in turn, codifies the common law and adds a requirement that, at the time the claimant first entered into possession of the property, that claimant had an "honest belief" of actual ownership that had an objective basis and was reasonable under the circumstances. *Lieberfreund*, 206 Or App at 490. That statute, however, applies only to claims that vest after January 1, 1990. Or Laws 1991, ch 109, § 3.

Plaintiffs do not meaningfully challenge defendant's evidence that his use was actual, open, notorious, continuous, and exclusive for the requisite period; instead, they argue that defendant failed to overcome, by clear and convincing evidence, a presumption that defendant's use of the land was merely permissive. Under well-established Oregon law, a claimant may prove hostility by providing clear and convincing evidence that the claimant possessed the disputed property with "a subjective intent to possess the property intending to be its owner and not in subordination to the true owner." *Hoffman v. Freeman Land and Timber, LLC.*, 329 Or 554, 561, 994 P2d 106 (1999) (internal quotation marks omitted). Hostile possession can be a product of the claimant's mistaken belief of actual ownership or of the claimant's intent to appropriate the property, to the exclusion of all others. *Stiles v. Godsey*, 233 Or App 119, 127, 225 P3d 81 (2009).

Hostility can be established by circumstantial evidence. *Lieberfreund*, 206 Or App at 493.

In *Hoffman*, the Supreme Court held that, absent affirmative proof of a subjective intent to possess or of honest mistake, a claimant asserting adverse possession is presumed to possess the property in "subservience to the legal title." *Hoffman*, 329 Or at 561-63. That presumption retains the burden put upon an adverse possession claimant to prove that his or her use is inherently inconsistent with a title holder's rights as an owner. *Id.* at 562-63. We have thus interpreted *Hoffman* to require additional evidence—beyond that which would be sufficient to prove open and continuous use—to prove hostility. *Lieberfreund*, 206 Or App at 493.

Here, we have the requisite additional evidence of hostility. Mike Mitchell, who lived and worked on the Mitchell farm from 1930 to 1951, testified that he had helped his parents (the title owners of the Mitchell farm) cultivate and manage the disputed property and that he had always believed that the disputed property was part of his parents' land. Although Mike never owned the farm in his own name, the fact that his parents never disabused him of that belief provides strong circumstantial evidence that they either shared that mistaken belief or intended to appropriate the property to themselves, and thus that they were in hostile possession of it from 1930 until 1968. Helms Sr. and Helms Jr., both longtime residents of the farm adjoining defendant's, testified that, based on their observations of the Mitchell family's, followed by Towery's and, most recently, defendant's use of the Mitchell farm, they have always believed that the farm encompassed the disputed property. Finally, defendant testified that, when he bought the farm in 1994, he believed that it included the disputed property. That belief was based in part on Towery's representation to defendant that he was buying the disputed property, and is thus evidence that Towery also intended to possess the property as its owner, not in subordination to plaintiffs' predecessors.

In sum, the evidence shows that the disputed property was surrounded by defendant's deeded property and that there were no physical boundaries between the two; that it was widely, if not universally, believed for many years that

the river formed the boundary between plaintiffs' and defendant's land; and that defendant and his predecessors farmed or otherwise occupied the land up to the river bank continuously and openly from as far back as 1930. We find that to be clear and convincing evidence that, for at least 10 years, defendant's predecessors in interest either believed that they actually owned the disputed property or intended to appropriate it and, thus, that they did not possess it in subordination to the true owners. That surveys and deeds existed showing that the disputed property belonged to plaintiffs does not detract from our conclusion, as defendant's and his predecessors' possession of the disputed property demonstrated to the "physical senses" that they intended to claim ownership of that property. *See Norgard et al v. Busher et ux*, 220 Or 297, 302, 349 P2d 490 (1960) ("The intent derived directly from the physical senses, *i.e.*, the intent to claim the land actually occupied, should be regarded as overriding the less immediately effective intent to hold in conformity with the deed." (Internal quotation marks omitted.)).

By citing *Parrish v. Minturn*, 234 Or 475, 479, 382 P2d 861 (1963), plaintiffs nonetheless appear to argue that defendant's claim fails because he was also required to prove that plaintiffs' predecessors had notice of hostility. In *Parrish*, the court held that a grantor who permissively retained possession after conveying the premises to the grantee, without representing to the grantee that he intended to hold the property in his own right, did not hostilely possess the land. 234 Or at 479-80. As we explained in *Rise v. Steckel*, 59 Or App 675, 686, 652 P2d 364, *rev den*, 294 Or 212 (1982), the rule applied in *Parrish* provides that,

> "[w]here a claimant seeking to establish title by adverse possession *originally entered the premises* with the permission of the legal owner, his possession is considered in subordination to that of the legal owner and does not start the statutory period running until, by words or conduct, the claimant asserts that he is holding in his own right and *brings that assertion to the knowledge of the rightful owner.*"

(Emphasis added; internal quotation marks omitted.) *Parrish* is inapplicable. There is no evidence in the record establishing that defendant or his predecessors originally entered into possession of the disputed property with the

permission of plaintiffs or their predecessors. Accordingly, defendant satisfied the hostility element of his claim.

We conclude further that the record shows that defendant's predecessors in interest adversely possessed the disputed property for at least 10 years before 1990 or, in other words, that the adverse possession claim vested before 1990, and that each of defendant's predecessors intended to convey the disputed property. Our conclusion forestalls plaintiffs' argument that defendant did not give credible testimony regarding the "honest belief" requirement of ORS 105.620(1)(b). That statute applies only to claims that vest after January 1, 1990, and is thus inapposite to this case. Or Laws 1991, ch 109, § 3; *Lieberfreund*, 206 Or App at 494-95 n 8. We also need not address plaintiffs' argument that the trial court erroneously discounted Fitts's testimony that she had twice granted defendant permission to farm the disputed property during two chance meetings, because, assuming that those meetings did take place, they occurred after defendant's title by adverse possession already had ripened.[3]

In short, defendant showed by clear and convincing evidence that, for at least 10 years before 1990, his predecessors in interest adversely possessed the disputed property. The trial court did not err in entering judgment for defendant.

Affirmed.

---

[3] In arguing that we should overturn any credibility determinations that may have been made by the trial court, plaintiffs, at any rate, choose a difficult road to travel: On *de novo* review, we give considerable weight to the findings of the trial judge who had the opportunity to observe the witnesses and their demeanor in evaluating the credibility of their testimony. *Union Cemetery Assn. of Crawfordsville v. Coyer*, 214 Or App 24, 34, 162 P3d 1072, *rev den*, 343 Or 691 (2007).