Argued and submitted May 12, 2011, reversed March 14, 2012

In the Matter of
K. B., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

B. B.
and K. M. N.,
*Appellants.*

Marion County Circuit Court
J100512;
Petition Number 073010BRE3;
A147227 (Control)

In the Matter of
E. B., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

B. B.
and K. M. N.,
*Appellants.*

Marion County Circuit Court
J100513;
Petition Number 073010BRE1;
A147228

In the Matter of
S. B., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

B. B.
and K. M. N.,
*Appellants.*

Marion County Circuit Court
J100514;
Petition Number 073010BRE2;
A147229

274 P3d 242

Mary Shannon Storey, Senior Deputy Public Defender, argued the cause for appellant B. B. With her on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Megan L. Jacquot argued the cause and filed the brief for appellant K. M. N.

Greg Rios, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

Wollheim, J., dissenting.

**NAKAMOTO, J.**

In this dependency case, father and mother appeal the juvenile court's judgments taking jurisdiction over their children, K, E, and S, under ORS 419B.100(1)(c). The parties dispute whether the Department of Human Services (DHS) proved that father and mother were endangering the welfare of the children, as DHS alleged in its petition to the court to take jurisdiction. Father, who discontinued sex offender treatment in April 1999, and mother contend that the minimum quantum of evidence to support jurisdiction—evidence of likely harm to the children, current at the time of hearing in 2010—is lacking. We exercise our discretion under ORS 19.415(3)(b) to review the facts *de novo* and agree that some of the juvenile court's findings of fact, including its key finding regarding risk to the children, are not supported by the evidence, and the findings that are supported by the record are insufficient to establish that the current condition or circumstances of the children are such as to endanger their welfare, the touchstone for jurisdiction under ORS 419B.100(1)(c). We therefore reverse the judgments.

Under ORS 19.415(3)(b), "the Court of Appeals, acting in its sole discretion, may try the cause anew upon the record or make one or more factual findings anew upon the record." Although in the vast majority of cases, we now do not review a juvenile dependency proceeding such as this one under the *de novo* standard, we choose to do so in this case, even though no party has requested it, because the trial court's most important factual findings either plainly do not comport with uncontroverted evidence in the record or are inconsistent with other express factual findings. *See* ORAP 5.40(8)(d)(ii) (a consideration relevant to whether the court makes findings anew upon the record is whether "the trial court's decision comports with its express factual findings or with uncontroverted evidence in the record"). Although we state the following background facts consistently with the juvenile court's ultimate conclusion to take jurisdiction, we make findings anew upon the record when we discuss the allegations against father and mother.[1]

_____

[1] The dissent suggests that our decision to review this case *de novo* is not in keeping with ORS 19.415(3) and ORAP 5.40(8). 248 Or App at 739 n 1 (Wollheim,

In the past, father physically and sexually abused children, and he was sexually abused when he was a child. In 1994, when he was 21 years old, father was convicted of criminal mistreatment for physically abusing his then-girlfriend's pre-school-aged children. She had left the children in his care while she was looking for work in another state. Father struck the three-year-old girl, who lost consciousness, and also struck her brother. He eventually took the children to the emergency room and admitted hitting the children in anger. Father served a prison sentence and was released on post-prison supervision in 1996.

One of the conditions of his supervision was that he undergo a sex offender evaluation and complete any recommended treatment. The Department of Corrections characterized him as a "predatory sex offender," stemming from information that a counselor in prison had obtained concerning father's own history of being sexually abused as a child and information in a presentence report that father, in addition to striking the three-year-old girl in his care, had sexually abused her. Father admitted to his probation officer, Bergey, that he had orally sodomized the girl and had masturbated in her presence.

---

J., dissenting). The dissent's view is inconsistent with the legislative history of the amendment to the statute and the language of the rule. As the Chief Judge of this court explained in testimony in support of the bill that amended ORS 19.415, the amendment to provide for discretionary, instead of mandatory, *de novo* review in almost all equitable cases was designed, in large part, to allow this court to "stretch its limited resources" in addressing the appellate caseload. Testimony, Senate Judiciary Committee, SB 262, Apr 9, 2009, Ex 12 (statement of Chief Judge David V. Brewer); *see also* Testimony, House Judiciary Committee, SB 262A, May 12, 2009, Ex 2 (statement of Chief Judge David V. Brewer) ("In addition, Oregon probably can no longer afford being one of the few states that provides universal de novo review of trial court decisions in equity cases."). As Chief Judge Brewer explained, the amendment to ORS 19.415 would give the Court of Appeals discretion to undertake *de novo* review, "similar to how the Supreme Court currently employs that standard." *Id.* Thus, although ORAP 5.40(8) provides guidance to litigants regarding how this court will exercise its discretion, this court, like the Supreme Court, *see, e.g., Haguewood and Haguewood,* 292 Or 197, 199, 638 P2d 1135 (1981) ("This being a case in equity, our permissible scope of review on the record is entire."), retains discretion to make findings anew on the record in any equitable case, as ORAP 5.40(8)(d) indicates: "The Court of Appeals considers the items set out below to be relevant to the decision whether to exercise its discretion * * *. These considerations, *which are neither exclusive nor binding,* are published to inform and assist the bar and the public." (Emphasis added.)

In August 1996, Cannon, a licensed clinical social worker, conducted a mental health and sex offender evaluation of father. In the evaluation report, Cannon noted that the medical staff who examined the three-year-old girl conducted a pelvic examination, which showed "mild bleeding of her genitals and significant engorgement of the veins of her rectum." Father also admitted that, when he was 11 or 12, he had orally sodomized a one-year-old girl he was babysitting and had orally and anally sodomized a four-year-old boy he was babysitting. Father said that he regularly viewed adult pornography. Cannon concluded that father was "in heavy denial that he has a sexual problem" and that his "steady diet of pornography and his lack of a regular sexual partner makes the risk even greater." Father, she concluded, was "both a physical and sexual risk to children," and she recommended that he be required to "enter and successfully complete a sexual offender treatment program."

Father began sex offender treatment with Doyle, but failed to attend treatment regularly. After father viewed child pornography in February 1998, Doyle discontinued treatment in March 1998. Father then resumed treatment with a different provider, Shannon, who worked with him in 1998 and 1999. Father admitted to mother that he had again viewed child pornography in July 1998, and she reported his conduct to Shannon and Bergey. Also in 1998, mother reviewed father's history, completed chaperone training, and signed a document approved by Shannon and Bergey in which she acknowledged that father's post-prison supervision conditions included that he have no contact with minor children. She also promised to be responsible for ensuring that father was not left alone with children and to contact Bergey and Shannon should father engage in inappropriate behavior. Mother and Shannon also discussed safety plans for children when they were around father. Father's post-prison supervision then ended in April 1999, and father discontinued his treatment in May 1999 without completing it.

Mother and father were living together in 1999, when mother was pregnant with their first child. Because father had discontinued sex offender treatment, Shannon

notified Bergey in May 1999 to let him know that he had concerns about father's ability to be "sexually safe around children" at that point. Father and mother's initial contact with DHS occurred in 1999, when their first child, K, was born. DHS then put a "no-contact order" in place to keep father from contacting K without permission from Shannon.

Near the end of 1999, mother and K moved to Ohio, where mother has family. Father followed several months later, arriving in Ohio in January 2000. Initially, for the first two to three years in Ohio, father lived with mother's sister and brother-in-law, while mother lived with her mother. Eventually, father and mother had the two other children at issue, E and S, and lived together as a family. Father and mother also had a fourth child, who has special needs and who lives with her maternal grandmother in Ohio. For most of the time that the family was in Ohio, father worked as a long-haul truck driver. Father was laid off in 2008 and had recently resumed working in Oregon before the trial.

Mother testified that Ohio child welfare authorities became involved when DHS contacted them, but that the Ohio authorities "had no issues with [father] being around children" and permitted father to live with her and the children. As mother testified, the condition that Ohio child welfare authorities wanted was for mother, not father, to have legal custody of the children. Mother also introduced a 2006 Ohio magistrate decision, which showed that the Ohio juvenile court was aware of father's "whole history about the sexual offending" and the earlier requirement that he engage in sex offender treatment. DHS employees did not provide contrary evidence. Instead, they acknowledged that they had reviewed written records from Ohio's child welfare authorities, that a petition in the Ohio juvenile court had been filed based on the potential risk to the children posed by father and by mother's knowledge of father's sex-offending history, that Ohio authorities had closed the case, and that father had lived in the home with mother and the children. Father was not required to complete sex offender treatment before Ohio authorities terminated the case involving father and mother. Ohio juvenile court records from 2007 also showed that the same magistrate permitted father to visit with mother and father's special-needs child without restriction.

In July 2010, mother and father moved back to Oregon. Soon after the family's return, DHS filed petitions alleging that K, E, and S were within the jurisdiction of the juvenile court. At the time of trial, K was 11, E was 9, and S was 4 years old.

Our analysis begins with the allegations against father. DHS alleged that the juvenile court had jurisdiction over each of the children and parents under ORS 419B.100(1)(c), which provides that the juvenile court "has exclusive original jurisdiction in any case involving a person who is under 18 years of age and * * * [w]hose condition or circumstances are such as to endanger the welfare of the person or of others." The key inquiry for determining whether jurisdiction lies under ORS 419B.100(1)(c) is "whether, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child." *Dept. of Human Services v. C. Z.*, 236 Or App 436, 440, 236 P3d 791 (2010).

DHS alleged two sets of conditions or circumstances justifying jurisdiction with respect to father. In paragraph 2.C of the petition, DHS alleged that jurisdiction was warranted because father "has a history of inappropriate sexual contact with minors and such behavior un-remediated endangers the child's welfare and safety." DHS alleged in paragraph 2.D of the petition that the children were endangered because father had "disclosed inappropriate sexual contact with minors and failed to complete the sex offender treatment as recommended by child welfare authorities." The juvenile court found that DHS had proved both allegations.

Thus, as to the allegation in paragraph 2.C, the court found that the children were in danger because (1) father had a history of inappropriate sexual contact with minors; and (2) his inappropriate sexual contact with minors was "unremediated," in other words, uncorrected or ongoing. DHS must prove a current risk of harm, so the evidence of father's past—inappropriate sexual contact with minors in 1994 when father was 21 and when father was himself a child, at age 11 or 12—does not by itself justify jurisdiction. Nor does father's viewing of child pornography in 1998, which the juvenile court also considered, provide a basis for a finding of *current* risk of serious harm to the children. *See, e.g., Dept. of*

*Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011) (the threat of serious loss or injury "must be current"); *State ex rel Juv. Dept. v. S. A.*, 230 Or App 346, 347, 214 P3d 851 (2009) (in dependency petitions, as the state conceded, the agency must allege a current risk of harm). Rather, the court's second finding—that father's conduct is unremediated—is the determinative historical fact that would support the conclusion that the children are in danger as DHS alleged in paragraph 2.C.

Consistently with what the petition alleged, the juvenile court's express finding of father's unremediated *sexual contact* with children goes to father's conduct or behavior as opposed to a mental condition or disorder. But an examination of the testimony at the jurisdictional hearing reveals that both that express finding and any implied finding as to an unremediated condition or disorder lack factual support.

Despite finding that father's conduct is unremediated, the juvenile court stated at the hearing that "it may be there haven't been any further acts" since father's sex offender treatment ended in 1999. In fact, there was no evidence from any source presented at the hearing that father had ever abused his children or any other children since 1994, some 16 years before the hearing. No one testified that father had been accused of having had sexual contact with his children, or with any other children since 1994. To the contrary, the DHS investigator admitted that the children had not reported sexual abuse and that DHS did not suspect that they had been abused "in any way." There simply is no evidence from which the juvenile court could have found that father sexually abused his children or had inappropriate sexual contact with any other children since 1994.

The juvenile court's comments on the evidence at the close of the hearing reveal that the court also misunderstood the testimony of Shannon, father's treatment provider in 1999, and Bergey, father's probation officer in 1999. The juvenile court noted that "the only evidence before the Court regarding the risk" to children posed by father was, in its view, "the information from the treatment provider" that "as time goes on, the longer you're away from treatment, the greater the risk [of sexually inappropriate behavior] actually

becomes." The court stated it was relying on that evidence "when determining that a risk still exists." Although the juvenile court was correct that such testimony was the only evidence of risks, the only "treatment provider" who testified, Shannon, provided no such testimony or information.

Shannon testified that he is a licensed professional counselor of 26 years and is certified as a sex offender treatment specialist by the Oregon Sex Offender Treatment Board. As noted, Shannon treated father in 1998 and 1999. Because of the age of the file on father, Shannon had purged it. Shannon recalled little about father; he knew that father had had sexual contact with minors but could not remember their ages or any other information about the circumstances of such contact. As a result, father's attorney objected to DHS's attempt to solicit Shannon's testimony about whether, for sex offenses like the ones that father committed, the offender must have treatment in order for "sexual offense behavior" to "go away." Ultimately, the juvenile court asked Shannon whether he could testify—without knowing anything about father other than that he had committed sexual offenses against minors—as to whether "sex offender treatment would be required for him to be in remission." Shannon's response was nuanced, but the bottom line was that completion of such treatment was *not* required for father to be "in remission."

Specifically, Shannon testified that the prevailing trend in the treatment community was that "therapy would increase the likelihood for remission and reduce the likelihood for recidivism," and that, hypothetically, if at the time of treatment, the client aborts the treatment prematurely, it is not "a positive sign," but

> "*ten years later*, I cannot tell you anything about where he's been, what he has done; *if the disorder was placed in remission based on willpower, based on readjustment of a moral position, based on conscience, based on some intervention informally by others who have assisted him to—to not recommit these types of offenses*, I just—I can't tell you anything about that."

(Emphasis added.) Thus, instead of testifying that father was at great risk of sexually abusing a child, whether because

father stopped treatment in 1999 or because it had been over a decade since father was last in treatment, Shannon informed the juvenile court that father could have made changes in his life during the 11 years following father's last treatment with Shannon so as not to "recommit these types of offenses." Nor did Shannon testify that a sex offender who does not complete treatment cannot remediate his conduct or condition.

Rather, the testimony that the juvenile court relied on came from father's former probation officer, Bergey. But even Bergey did not testify in accordance with the juvenile court's recollection of the "treatment provider" testimony. Bergey had experience as a probation officer supervising sex offenders. Father objected to Bergey's opinion testimony regarding whether father's inappropriate sexual contacts with minors "could become remediated on their own" as speculation. In aid of his objection, and as father notes on appeal, father established that (1) Bergey was not "qualified through training to provide sex offender treatment," and (2) Bergey had had no contact with father in the 11 years preceding the hearing. Accordingly, the juvenile court then sustained father's objection to Bergey's opinion testimony. We agree with father that what Bergey later actually testified about was his "concerns" in 1999.

Bergey stated that he was "concerned" back in 1999 that father "was at risk to reoffend" because father had not completed sex offender treatment. Bergey was then asked whether father's treatment would have alleviated that concern in 1999, and Bergey said:

> "It would not have completely alleviated those concerns. From my training and my reading on sex offender crimes, it's not something that can be cured. It's something that hopefully can be monitored and controlled while on supervision. And the longer someone gets past supervision and treatment, the more likely [it] is that something could happen again."

At best, then, Bergey described his beliefs in 1999. But Bergey's belief system and "concerns" in 1999 do not provide a foundation for finding that father's behavior or condition in 2010 was "unremediated," as alleged in paragraph 2.C of the

petition. The juvenile court was not permitted to treat Bergey's testimony about his state of mind in 1999 as expert testimony concerning father's risk of reoffending, and we do not either. *See* OEC 701(1); *State v. Lerch*, 296 Or 377, 384, 677 P2d 678 (1984) (an "essential difference between opinion testimony by a lay witness and an expert witness is that the lay witness is restricted to his personal perceptions"). In fact, when the juvenile court sustained father's objection to Bergey's opinion testimony, it recognized that permitting Bergey to testify as a sex offender treatment expert would be improper.

As father summarizes:

> "To meet its burden the department presented evidence (1) that, when father was released from parole 11 years prior to the jurisdictional hearing, father's treatment provider (Shannon) and his parole officer (Bergey) were 'concerned' that father might re-offend; (2) that by the time of the hearing, father had lived with his children for seven years and had unsupervised contact with them over the last two years; (3) that, upon questioning, the children did not report any sort of abuse or neglect; and (4) that the 'philosophical position' of the prevailing therapeutic community was that 'therapy would increase the likelihood for remission and reduce the likelihood for recidivism.'"

We agree with father that "[t]hat evidence fails" to satisfy DHS's burden of proof. The juvenile court erred in finding jurisdiction as to father based on the grounds alleged in paragraph 2.C of the petition.

For similar reasons, we disagree with the juvenile court's finding that father endangers the children because he failed to "complete sex offender treatment as recommended by the child welfare authorities," as alleged in paragraph 2.D of the petition. Although it is undisputed that father terminated sex offender treatment with Shannon in 1999 and did not engage in additional treatment, there is no evidence in this record that Oregon or Ohio child welfare authorities had required father to engage in additional sex offender treatment. And, as discussed with respect to the allegations in paragraph 2.C of the petition, the record in any event lacks evidence that father's failure to engage in further sex

offender treatment endangered the children at the time of the hearing in 2010.

To the extent that the juvenile court made an implicit finding that father had a "sex offender" condition that was not in remission, we find that the evidence does not support it. Shannon testified that a sex offender can change, on his own, without sex offender treatment, and father has not sexually abused any of his children, nor is he even suspected of having abused any of his children. On the record in this case, father's failure to complete treatment in 1999 does not establish a current risk of abuse. *Cf. A. F.*, 243 Or App at 387 (proof that the father possessed images and partially downloaded videos of child pornography was insufficient to establish that the father endangered the welfare of his children under ORS 419B.100(1)(c) in light of testimony by the state's sex offender treatment expert that the father posed a "potential risk," but that he would need additional information, such as how recently and frequently the father had used the pornography, before he could determine whether the father was an actual risk to his children). Stated another way, there is no presumption that father's failure to complete treatment some 11 years before the jurisdictional hearing, by itself, makes father "an unremediated sex offender," who in turn would be presumed dangerous to his children. That result is at odds with the proof requirement under ORS 419B.100(1)(c). *See State ex rel Juv. Dept. v. Smith*, 316 Or 646, 652-53, 853 P2d 282 (1993) (rejecting "the proposition that any specific condition or circumstance *per se* does, or does not, establish the juvenile court's jurisdiction" under *former* ORS 419.476(1)(c) (1983), the predecessor to ORS 419B.100(1)(c)); *State ex rel Dept. of Human Services v. D. T. C.*, 231 Or App 544, 554, 219 P3d 610 (2009) (evidence that parent failed to complete treatment is not sufficient in itself to prove that condition precipitating treatment requirement persists).

Nor do the 1996 observations by Cannon contained in her written evaluation admitted into evidence support a finding that father's condition was not in remission at the time of this proceeding some 14 years later. Although Cannon's 1996 evaluation states that father was then in

denial about his problem, her observations of father in 1996 do not establish that he in fact did not change during the intervening 14 years. Moreover, we have rejected evaluations for purposes of determining risk of parental harm to children where the evaluation's predictions are inconsistent with the evidence of the parent's actual circumstances. *See D. T. C.*, 231 Or App at 554-55 (no reasonable likelihood of harm to the children proven when only evidence presented by DHS at the jurisdictional hearing regarding the father's risk of alcoholic relapse was an evaluation, one and a half years old, that stated the father's risk of relapse was then "severe" due to his denial that he had an alcohol problem and resulting unwillingness to change, yet he had since stopped drinking, last used alcohol 10 months earlier, and had made the decision not to drink). In this case, the 14-year gap between Cannon's evaluation and the jurisdictional hearing is a temporal canyon, and the 1996 evaluation does not establish that father currently poses a risk of harm to the children.

Although the juvenile court was not required to credit the testimony of either father or mother, the other evidence in the record is insufficient to prove the jurisdictional allegations pertaining to father.[2] In sum, the juvenile court erred in finding jurisdiction as to father.

---

[2] The dissent argues that we should affirm the juvenile court because it was entitled to draw different inferences and DHS had established evidence from which a reasonable factfinder could conclude that father was a danger to his children. 248 Or App at 741 (Wollheim, J., dissenting). There are a number of problems with the dissent's discussion. First, it cannot be overemphasized that the set of facts that the dissent argues is sufficient evidence to establish father's current danger to his children, *id.* is drawn from father's statements or Cannon's observations in the report Cannon prepared in August 1996. Second, the dissent contends that, applying "ordinary experience," the trial court could have concluded that, given a period of 10 years between father's abuse of children when he was 11 or 12 years old and when he was 21 years old, despite the 16-year gap between the time father was 21 years old and the time of trial, it need not allow father to remain with his children without state intervention. *Id.* Even assuming for the sake of argument that the juvenile court could have drawn the inference that father is a current risk to his children's safety, we review this case *de novo*, and not under the standard of review the dissent applies. And, the dissent's "ordinary experience" trope cuts both ways. Similar to the case law acknowledging the legislative assumption in the dependency laws that people can change their behavior, as discussed above, ordinary experience indicates that a child's and young person's conduct is usually not the conduct of that same person as a mature adult. Most importantly, though, the evidence presented in light of applicable legal standards (or, as in this case, the lack of such evidence) governs the outcome in this or any case, not hunches or feelings cast as ordinary experience.

We turn to the allegations against mother. The juvenile court concluded that it had to find that mother "exposed the child to an unsafe person, including the child's father, who has a history of sexual offending of minor children" and that she thus was "endangering the children." In other words, the finding was derivative of the court's conclusion that father was dangerous with regard to the children. Because the evidence did not support the finding against father, DHS did not prove the allegation in paragraph 2.A of the petition that mother exposed the children to an "unsafe person," namely, father.

As to the allegation in paragraph 2.B that mother was aware of father's risk to the children and failed to protect them from him, the juvenile court found that the Ohio juvenile court knew "the whole history about the sexual offending and Dad's requirement to do sex offender treatment. All that information [is] included in the 2006 decision." Consequently, the juvenile court concluded that the evidence of the proceedings in Ohio did not support a finding against mother that she was aware of the risk that father posed to the children and then failed to protect them. Instead, the court turned to mother's own testimony that she had chosen to supervise father's contact with the children even after the Ohio juvenile court concluded that it was unnecessary. The juvenile court found "that Mom was aware because she continued to provide supervision or chaperone Dad up until two years ago. She was still aware that Father presented a risk, and that's after these orders from the court in Ohio [allowing father unsupervised contact with the children] were imposed." The court then added that mother "had gone through the chaperone class and knew that he was a risk, and that he continued to be a risk and continues today to be a risk to the children." We disagree with the court's conclusion.

First, the juvenile court's findings regarding mother's conduct is based in large part on the erroneous conclusion that the evidence showed father was a current danger to the children. Second, as to mother's alleged failure to protect the children from father, the juvenile court found that mother had gone above and beyond the requirements of the Ohio juvenile court by chaperoning the children with father until 2008, when father stayed at home with the children.

Mother's choice to do so does not prove that father actually presented a risk to the children when she ceased chaperoning, or that she knew father posed a danger to the children at the time she ceased chaperoning or thereafter, at the time of the hearing. Accordingly, the evidence does not establish grounds for jurisdiction with respect to mother.

Reversed.

**WOLLHEIM, J.,** dissenting.

For the reasons that follow, I respectfully dissent from the majority's conclusion that the juvenile court erred when it found that DHS established, by a preponderance of the evidence, that the children's current conditions endanger their welfare and safety. I would not exercise our discretion to review this case *de novo* but would instead defer to the explicit and implicit factual findings of the juvenile court, which are supported by evidence in the record. In any event, though, I would find that DHS proved, by a preponderance of the evidence, that father, having never remedied the condition that caused him to sodomize young children in his care, poses a current risk to such children, including his own.

Initially, with regard to the standard of review, the majority concedes that neither party has requested *de novo* review but nonetheless engages in that type of review because the juvenile court's "most important factual findings either plainly do not comport with uncontroverted evidence in the record or are inconsistent with other express factual findings." 248 Or App at 718. I dispute that characterization of the court's findings, as discussed more fully in the course of this dissent.

As to the merits, this case is not, as the majority contends, about whether a "sex offender can change, on his own, without sex offender treatment"; nor is it about whether there is a "presumption" that father's failure to complete treatment makes him an " 'unremediated sex offender.' " 248 Or App at 727. Regardless of whether it was *possible*, short of completing sex offender treatment, for father to remedy whatever caused him to orally and anally sodomize children left in his care, the juvenile court was unwilling to accept father's self-serving report that any such transformation

occurred. In other words, the juvenile court did not believe that father, through willpower or otherwise, had remedied the tendency to sexually abuse children that was manifest when father ceased treatment in 1999. I would credit that first-hand assessment, whether or not we engage in *de novo* review. *Fitts v. Case*, 243 Or App 543, 552 n 3, 267 P3d 160 (2011) ("On *de novo* review, we give considerable weight to the findings of the trial judge who had the opportunity to observe the witnesses and their demeanor in evaluating the credibility of their testimony.").

This case is really about father's 10-year absence from Oregon and whether that passage of time precludes the inferences that would otherwise reasonably be drawn about the risks posed by a person who has sodomized small children. In my view, the passage of time is evidence that a court considers in determining whether someone with father's history continues to pose a risk to children, but the passage of time does not wipe the slate clean. The record includes evidence that father has an extensive history of sexual abuse; that he failed to complete a sex offender program (after again viewing child pornography); that he was unable to appreciate the nature of his conduct; and that he had a tendency to place blame elsewhere. After considering that and other evidence, the juvenile court took jurisdiction of the children on the ground that father poses a present risk to repeat his prior conduct—a risk that mother fails to appreciate. The record supports the juvenile court judgment, and I therefore respectfully dissent.

Many of the relevant facts are recited in the majority's *de novo* review. At the risk of redundancy, some of them bear repeating, along with additional context. In 1994, father's then-girlfriend left her children with father while she was out of town looking for work. During that time, father beat one of the children, a three-year-old girl, into a state of unconsciousness. He eventually became concerned and took the girl and her brother to a hospital emergency room. At the hospital, the children displayed signs of abuse, and father acknowledged that he had struck them in anger. Medical staff attempted to conduct a pelvic exam of the girl, but she became so hysterical that they elected to anesthetize her. While she was under anesthesia, an examination revealed

"mild bleeding of her genitals" and "significant engorgement of the veins of her rectum." Father later admitted that he had orally sodomized the girl but denied having anally penetrated her. Father was convicted of criminal mistreatment of both children.

In 1996, the Department of Corrections (DOC) released father to community supervision. Although he had not been convicted of a sexual offense, the department nonetheless characterized him as a "predatory sex offender" based on the girl's pelvic examination and father's "extensive history of childhood abuse."

Along with the "predatory sex offender" designation, DOC required father to submit to a mental health evaluation. Father then met with Cannon, a social worker who conducted a sex offender evaluation. During the evaluation, father backtracked on his earlier admission about sexually touching the three-year old, but he acknowledged that he had "masturbated in [the child's] presence while in bed with her"; in an earlier polygraph, father had acknowledged that, "in one instance of masturbating in [the child's] presence he had ejaculated near enough to get semen on her clothing." Father "seemed surprised" that Cannon considered masturbating in the child's presence to be sexual abuse.

During the evaluation process with Cannon, father made other disturbing revelations. As part of an autobiography that he completed, father reported engaging in sexual abuse of a four- or five-year-old boy when father was approximately 12. He described his conduct as "forced anal penetration." Father also described another incident when he was 10 or 11, when he "performed oral sex on a girl who was two or three years of age."

In her August 1996 evaluation report on father, Cannon explained:

> "Even without an admission from [father] that he caused the physical injury to [his girlfriend's daughter's] genitalia and rectum there is ample evidence that he is both a physical and sexual risk to children. He is in heavy denial that he has a sexual problem as indicated by his failure to recognize that his exposing himself and masturbating in close proximity to [the child] was abuse or that his sexual

abuse of two very young children while he was babysitting as a youngster was anything out of the ordinary. His strong tendency to place blame elsewhere and his great efforts at making himself look completely circumspect would make it easy for him to claim that some precocious child was coming on to him if he were allowed to be in close proximity to one. [Father's] steady diet of pornography and his lack of a regular sexual partner makes the risk even greater.

"For these reasons, I am recommending that [father] *be required to enter and successfully complete a sexual offender treatment program.* Due to the severe nature of his personality disorder, treatment is likely to be difficult requiring that the therapist be both supportive and confrontive. * * *."

(Emphasis added.)

Based on that recommendation, father began a sex offender treatment program. Father, however, failed to regularly attend the group, and, in February 1998, he violated a condition of his post-prison supervision by viewing child pornography. He was then terminated from the group. In July 1998, father again violated his conditions of post-prison supervision by viewing child pornography on the Internet.

Toward the end of 1998, father began treatment with a different provider, Shannon. During the course of father's treatment with Shannon, mother agreed to serve as father's "chaperone" and signed a form stating that she had reviewed father's sexual history, was aware of his conditions of post-prison supervision, and agreed to be "responsible for not leaving [father] alone unsupervised around any children." At that time, mother was pregnant with the couple's first child, K.

In April 1999, father's post-prison supervision ended, and he immediately discontinued his treatment. Shannon was concerned that father still presented a risk to children, and he contacted father's parole officer, Bergey. Shannon, aware of mother's pregnancy, also contacted DHS in advance of the birth. A DHS caseworker showed up at the hospital when K was born in May 1999, and DHS "put a no-contact order in place" that prohibited father from contacting K without Shannon's permission.

Later that year, mother and K moved to Ohio to live with her family. Father joined them shortly thereafter, in January 2000. The parties resided in Ohio for the next 10 years and, during that time, had other children: E was born in November 2000; C was born in 2002; and S was born in 2006. While in Ohio, the family had "numerous contacts" with child welfare authorities. The precise nature of those contacts is not developed in this record. Child welfare services in Ohio apparently at one point filed a petition for jurisdiction based on the risk that father posed to the children, but that case was later closed. For a period of the time, the children were in the care of their maternal grandmother. The record also includes orders from an Ohio court that allow mother and father visitation rights with respect to C, who was in the custody of her maternal grandmother. There is no evidence that father harmed any of the children during their time in Ohio; indeed, the order allowing father visitation of C does not specify that the visitation must be supervised.

In July 2010, mother and father returned to Oregon, along with K, E, and S. At that time, DHS contacted father to determine whether, during his time in Ohio, he had completed a sex offender treatment program. Father indicated that he had not done so and that he did not plan to do so because "he was not on parole any longer." DHS then petitioned the juvenile court to take jurisdiction over K, E, and S. DHS alleged that the following conditions and circumstances endangered each child:

- "The child's mother has exposed the child to unsafe persons, including the child's father who has a history of sexually offending minor children."

- "The child's mother is aware of the child's father's risk to minor children, including the child, and failed to protect the child from the child's father as suggested by child welfare authorities in Oregon and Ohio."

- "The child's father has a history of inappropriate sexual contact with minors and such behavior un-remediated endangers the child's welfare and safety."

- "The child's father has disclosed inappropriate sexual contact with minors and failed to complete the sex offender treatment as recommended by child welfare authorities."

At the hearing on the petition, DHS offered the testimony of Shannon, father's last treatment provider. Shannon, who had not treated father in over a decade, had purged his files and no longer had records of father's treatment. Shannon was asked to testify based on his memory, as exemplified by this exchange with the court:

"THE COURT: I think the lawyers are trying to be very specific about what you know and don't know, and what you're assuming. And I think you've indicated to the Court that you don't remember what the specifics of his offense were, how old the children were, or what relationship—

"[SHANNON]: * * * [Y]es. The—pushing myself to be as accurate as I possibly can and—and remain useful to your hearing, that's true. I don't remember the ages of the children and I don't remember the offending that was specified.

"THE COURT: So in not knowing those things and only knowing that his sex offenses were against minors, can you tell me whether or not sex offender treatment would be required for him to be in remission?

"[SHANNON]: Well, Your Honor, again, the—the prevailing trend of the therapeutic community would say yes; therapy would increase the likelihood for remission and reduce the likelihood for recidivism. That would be our philosophical position * * *.

"* * * * *

"[SHANNON]: * * * I mean, it's a hypothetical question. And if somebody comes through a treatment program and we have determined that sexually nefarious behavior has occurred and that it's our recommendation that treatment proceed because of that—which would be designed to place a disorder in remission at that time and to effect an increase in the likelihood that recidivism would not occur.

"If somebody aborts the treatment process prematurely having not completed it, we would not see that as a positive sign. And we would be concerned about the safety of that individual in the presence of minors at that point.

"Now, ten years later, I cannot tell you anything about where he's been, what he has done; if the disorder was placed in remission based on willpower, based on readjustment of a moral position, based on conscience, based on some intervention informally by others who have assisted him to—to not recommit these types of offenses, I just—I can't tell you anything about that."

Thus, Shannon's testimony pertained only to whether he considered father to be a risk to children during the "window of time around the time that [he] worked with him." He testified that, "[a]t that time, I would have had concerns about his ability to be sexually safe in the presence of minors. I would not have called his probation officer or the caseworker * * * to express my concern if that had not been the case."

DHS also called Bergey, father's former parole officer, as a witness. Bergey, like Shannon, had not had contact with father while he was in Ohio. Bergey was asked whether, at the time father's post-prison supervision expired, he had "an opinion as to whether [father] was at risk to reoffend[.]" He testified, "I would have—I was concerned, based on—based on the history. Based on the failure to get all the way through treatment." He was later asked whether treatment would have alleviated his concerns about father. He responded,

"It would not have completely alleviated those concerns. From my training and my reading on sex offender crimes, it's not something that can be cured. It's something that hopefully can be monitored and controlled while on supervision. And the longer someone gets past supervision and treatment, the more likely is that something could happen again."

Mother and father also testified at the hearing. Mother testified, among other things, that she had arranged so that father had not had unsupervised contact with the children until "the last two years." She was asked "what changed in the last two years, in your mind?" She explained that the children are aware of the "issues that their father has had in the past" and, "[w]ell, for one, the kids are older. And two, they—me and them have a very open relationship. They know that they can trust me to tell me."

Father, meanwhile, testified that he had no intent to complete sex offender treatment because he has changed. He testified,

"I—I've morally changed from that kid I was 20 years ago. I have a stronger family support network than I did then. I'm aware of more about myself and triggers and to be more vocal. If I'm in a stressful situation of any kind, I leave. I don't fight, I don't argue."

Father added that he had also been in a long-term relationship with mother and that "[a] partner in a relationship makes a huge difference."

The juvenile court ultimately took jurisdiction over the children, finding that DHS had proved its allegations by a preponderance of the evidence. The court found that father "has a history of inappropriate sexual contact with minors, and that such behavior un-remediated endangers the children's welfare and safety." The court relied heavily on the testimony of Shannon and Bergey:

"The information received from the treatment provider and the probation officer do indicate that, while the treatment provider does not have a great recollection of the case, that he was concerned enough about Father not completing the treatment that he made several calls to identify or to warn the probation office, child welfare, and Mom that Dad has not completed what he was ordered to complete, and that he therefore poses a risk to the children.

"While it may be there haven't been any further acts since that time, the information from the treatment provider is that, as time goes on, the longer you're away from treatment, the greater the risk actually becomes. That is the only evidence before the Court regarding the risk. And the Court is considering that when determining that a risk still exists. It is a preponderance of the evidence, not proof beyond a reasonable doubt or proof beyond a shadow of a doubt; only a preponderance of the evidence. And I do find the State has met that burden.

"[With respect to allegations] that the child's father has disclosed inappropriate sexual contact with minors and failed to complete sex offender treatment, as recommended by the child welfare authorities, I do find that this conduct also unremediated endangers the children, both [E] and

[K], but also [S], given his age of four. And then I'm not only considering the underlying inappropriate behaviors, but then, while in treatment, the use of pornography and how that was a concern in the original evaluation."

Based on its findings regarding father, the juvenile court also found that mother was aware of the risk that father posed and had failed to protect the children. Of particular note, the court specifically found that mother, until two years before the hearing, herself believed that father posed a risk to the children. The court drew that inference from mother's efforts to prevent father from having unsupervised time with them, even after the Ohio court had allowed visitation of C without that restriction. The court explained:

"I find that Mom was aware because she continued to provide supervision or chaperone Dad up until two years ago. She was still aware that Father presented a risk, and that's after these orders from the court in Ohio were imposed. So even after those were imposed, she continued to provide supervision to Dad. I don't know what it is that made her stop doing that. Whether it was something Dad said or something else that happened. But there's nothing with regards to treatment that happened, there's nothing regards to a polygraph that happened, but it is just a decision that Mom made."

On appeal, mother and father argue that the evidence was legally insufficient to establish jurisdiction over their children. Father "acknowledges that his history is troubling" but contends that his history alone does not "prove, by a preponderance of competent evidence, that father's children were currently at risk of harm in father and mother's care[.]" (Emphasis omitted.) That is, father concedes that DHS proved "a troubling history and that he had not completed sex offender treatment," but he argues that "those facts do not establish that father has not 'remediated' his history much less that there was a reasonable likelihood that father would offend against his children." Mother similarly argues that father's history alone is not enough to establish a current risk of harm to their children; she further argues that, in any event, "[i]t is unreasonable to assume that Mother * * * was unable to determine that father was in

remission and able to safely have contact with his own children." Neither mother nor father suggests that this court should engage in *de novo* review of the record.[1]

Nonetheless, the majority concludes that *de novo* review is required in this case because the juvenile court's finding that "father's conduct is unremediated"—the "determinative historical fact that would support the conclusion that the children are in danger as DHS alleged in paragraph 2.C"—finds no support in the record.[2] *See* 248 Or App at 723; *id.* ("[A]n examination of the testimony at the jurisdictional hearing reveals that both that express finding and any implied finding as to an unremediated condition or disorder lack factual support."). I disagree with that view of the record and of the trial court's findings.

The evidence, in my view, was sufficient to establish, consistently with the juvenile court's conclusion, that at the time father ceased treatment in 1999, his condition was not in remission, he had no inclination to pursue treatment of that condition unless legally compelled to do so, and the condition, not in remission, posed a risk to children left in his care. In other words, at the time that he ceased treatment in 1999, father posed a risk of abusing children.

That brings us to the complicating factor in this case: the 11 years since father ceased treatment. Father contends that, because DHS cannot point to any offending conduct by father over the past decade, the only possible conclusion is

---

[1] ORS 19.415(3)(b) provides that this court "may try the cause anew upon the record." ORAP 5.40(8) provides guidance as to when this court will exercise *de novo* review under ORS 19.415(3)(b). ORAP 5.40(8)(a) and (b) state that, when the appellant requests that we exercise our discretion to review a matter *de novo*, the appellant "shall concisely state the reasons why" this court should exercise its discretion. Because neither parent requested *de novo* review, there were no concisely stated reasons. ORAP 5.40(8)(c) states that requests for *de novo* review are disfavored because the court will only review the record anew in exceptional cases, so there is a presumption against this court exercising its discretion to review *de novo*.

[2] The majority characterizes the juvenile court's finding regarding the danger posed by father as a finding that "his inappropriate sexual contact with minors was 'unremediated,' in other words, uncorrected or *ongoing*." 248 Or App at 722 (emphasis added). The majority conflates the *uncorrected behavior* with the *ongoing risk* that father will repeat that behavior. The court did not find that father was actually having ongoing sexual contact with children, but only that the behavior—or, more accurately, whatever caused that behavior—had not been remedied or corrected, thereby creating a risk that it would be repeated.

that father's condition is in remission and no longer poses a risk of harm to his children. I appreciate that a considerable amount of time has passed since father's last documented incidence of viewing child pornography or of sexual abuse. But in my view, the passage of time is just one of the multiple facts that the juvenile court must consider when assessing the risk posed by father. A factfinder might infer from the passage of time, as well as father's and mother's testimony, that father has overcome whatever caused him to commit acts of abuse against children and that he no longer poses such a risk. I am not convinced, however, that such an inference is *compelled* on this record. Rather, the evidence supports the finding—again, implicit in the court's ultimate determination—that father's condition did not disappear or go into remission after he ceased treatment.

First, father admitted that he did not seek treatment during that intervening period. Second, there is evidence that father's condition would not simply go into remission on its own. Shannon, a treatment provider with 26 years of counseling experience, testified that "the prevailing trend of the therapeutic community" was that sex offender treatment was required in order for a sex offender to be in remission, and that, if an individual has been recommended treatment "designed to place a disorder in remission at that time and to effect an increase in the likelihood that recidivism would not occur," the fact that the offender subsequently "aborts the treatment process prematurely having not completed it" would cause concern "about the safety of that individual in the presence of minors at that point."

Shannon acknowledged, as the majority emphasizes, 248 Or App at 724, 727, the possibility that father's "disorder [could be] placed in remission based on willpower, based on readjustment of a moral position, based on conscience, based on some intervention informally by others who have assisted him to—to not recommit these types of offenses."[3] And father later testified that, through a change

___

[3] Seizing on this acknowledgment, the majority concludes that the "bottom line was that completion of such treatment was *not* required for father to be 'in remission.'" 248 Or App at 724 (emphasis in original). Shannon's testimony, read as a whole, paints a very different portrait: that, from a philosophical point of view, the prevailing trend in the therapeutic community is that sex offender treatment *is*

in moral position and willpower, as well as a stable relationship, he had overcome his past tendencies to abuse children. But the juvenile court was not required to credit—and, indeed, did not credit—that testimony. Nor was the court required to believe mother's testimony regarding father's condition, particularly when, until two years before the family moved back to Oregon, mother herself apparently did not trust father to be alone with the children.

Rather, the juvenile court was entitled to draw different but nonetheless reasonable inferences about the risks posed, even more than 15 years later, by someone who would commit the acts admitted by father. That is, the juvenile court could rely on its own experiences in concluding that father was unlikely to remedy, on his own, whatever significant underlying condition or disorder caused that type of abusive act. *See Skeeters v. Skeeters*, 237 Or 204, 214, 389 P2d 313 (1964) (factfinding function is "to apply the ordinary experience of [people] to the disputed facts and arrive at the conclusion their reasoning dictates"). The evidence supported an inference that father lacked the insight and desire to address his condition on his own, including the facts that he did not consider masturbating near a child to constitute abuse, that he did not consider sexual abuse of the children he was babysitting to be "anything out of the ordinary," that he left treatment as soon as he was no longer required to be there under the terms of his post-prison supervision, that his sex offender evaluation indicated a "strong tendency to place blame elsewhere," and that "the severe nature of his personality disorder" would make even treatment difficult.

Indeed, father's own history supports an inference that the passage of time, alone, will not alleviate his risk of reoffending. Father has in the past remained a risk to reoffend despite going relatively long periods without abusing; in fact, father's admitted instances of sexual abuse also were separated by a decade: sodomizing toddlers when he was 11 or 12, and sexually abusing his then-girlfriend's child when

---

required, and an individual's failure to complete a treatment program is not "a positive sign" and would cause concern "about the safety of that individual in the presence of minors at that point." Shannon's allowance for a possible exception to that philosophical position—particularly in the case of someone he had not treated in more than a decade—cannot be read for more than that.

he was 21. Even if a "clean record" could, in some circumstances, *compel* the conclusion that a sexual offender no longer poses a risk of offending, this would not be that case.[4]

The majority's other justification for reviewing *de novo*—that, in reaching its conclusion that father continues to pose a risk of reoffending, the juvenile court impermissibly treated Bergey's testimony as expert testimony, 248 Or App at 726—likewise is not persuasive to me. The juvenile court does appear to have blended the testimony of Shannon, father's treatment provider, and Bergey, his parole officer, when orally recounting the evidence at the close of the hearing:

> "While it may be there haven't been any further acts since that time, the information from *the treatment provider* is that, as time goes on, the longer you're away from treatment, the greater the risk actually becomes."

(Emphasis added.) Bergey, not Shannon, had testified that "[t]he longer someone gets past supervision and treatment, the more likely is that something could happen again." But, whether or not the juvenile court misspoke in its oral recitation, I am not persuaded that the court misunderstood the evidence of risk or its import. The juvenile court, in its previous sentence, had explained that father "has not completed what he was ordered to complete, and that he therefore poses a risk to the children." Implicit in that finding is that father's condition, at the time that he ceased treatment, had not been remedied. The court then paraphrased Bergey's testimony—unremarkable in the context of someone who still needs treatment—that "the longer you're away from treatment, the greater the risk actually becomes."

In short, I would conclude that there is evidence in this record from which the juvenile court could find that father's "unremediated" conduct poses a *current* risk to K, E, and S. Father's previous acts of sexual abuse were committed

---

[4] It is worth noting that father's time with the children over the past 11 years was almost always supervised. The record suggests that father was only living in the home with the children sporadically; he had a separate residence for the first few years after he arrived in Ohio, and his job as a long-haul truck driver often took him away from the family. Until the last two years, mother had not allowed father to have any unsupervised contact with the children.

against young children while father was in the role of care-taker. K, E, and S are each young children (ages 11, 9, and 4, respectively, at the time of the hearing) who recently have been left unsupervised in father's care. There is evidence in the record that father has not remedied whatever caused him to commit that abuse in the past and that he therefore poses a current risk of harm to K, E, and S.

Relatedly, there is sufficient evidence to support the juvenile court's finding that mother fails to appreciate the risk that father's condition continues to pose to the children. Mother testified repeatedly that father does not pose any risk to her children;[5] that she did not know why father terminated his sex offender treatment, but that it had no impact on her decision to have additional children with him; that she has left the children with him unsupervised over the past two years; and that she effectively trusts K, E, and S to police their father's sexual conduct and report to her. On those facts, a reasonable trier of fact could conclude, by a preponderance of the evidence, that mother was unable to appreciate the risk that father poses or to protect them from that risk.

In sum, the juvenile court was not convinced that father's conduct, which posed a risk to young children at the time he left treatment, had since been remedied. Neither am I. Thus, I would defer to the juvenile court's factual findings and affirm its jurisdictional judgment under either a *de novo* or "any evidence" standard.

Accordingly, I respectfully dissent.

---

[5] When initially asked whether father presented a risk of harm to her children, mother testified, "Well, I think a lot of people can be a risk." She was later adamant that father was not a risk.