Argued and submitted February 7, remanded with instructions to enter a new jurisdictional judgment omitting the findings that DHS proved allegations 2(c) and (h); otherwise affirmed April 17, petitions for review denied August 15, 2013

(354 Or 61)

In the Matter of V. H.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent*,

*v.*

M. H.
and B. R.,
*Appellants*.

Josephine County Circuit Court
110119J;
Petition Number 110119J01;
A152188

300 P3d 1262

Holly Telerant, Deputy Public Defender, argued the cause for appellant M. H. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Christa Obold-Eshleman argued the cause and filed the brief for appellant B. R.

Laura S. Anderson, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

## HADLOCK, J.

Mother and father appeal juvenile court judgments in which the court asserted jurisdiction over their daughter, V, and placed her in the custody of the Department of Human Services (DHS) on the ground that child's condition and circumstances endangered her welfare. Mother asserts on appeal that the juvenile court lacked personal jurisdiction over V and also lacked subject matter jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act. Both parents contend that the court erred in concluding that child's condition and circumstances endangered her welfare. We conclude that two of the allegations in the jurisdictional petition are not supported by any evidence in the record, but that the juvenile court's exercise of jurisdiction was nonetheless proper.

Before we set out the material facts, we address the scope of our review. Under ORS 19.415(3)(b), we have discretion in juvenile dependency cases to review the record *de novo*. Mother and father request that we exercise *de novo* review in this case. We conclude that this is not the sort of "exceptional" case that warrants *de novo* review. *See* ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases."). Accordingly, we are bound by the facts found by the juvenile court as long as they are supported by any evidence in the record. *Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010). We describe the facts in accordance with that standard.

A number of the allegations in DHS's jurisdictional petition related to two sex offenses that father committed against children when he was a teenager. In 1984, when father was 14, he was adjudicated a juvenile delinquent for raping a three-year-old girl. While in the custody of the Oregon Youth Authority, he completed a juvenile sex offender program. Father was released from custody when he turned 18. The following year, father engaged in oral sex with his 10-year-old cousin, whom he was babysitting. He was not prosecuted for that offense for nearly five years. In the meantime, father married a woman with two daughters,

who were ages 12 and 14 at the time. Father and his then-wife had another daughter, B, around 1993. No allegations of improper treatment of any of those children are in the record. Father testified at the jurisdictional hearing that he continued to maintain contact with B.

In 1994, father was charged with and convicted of first-degree sodomy based on his conduct with his cousin. He was incarcerated for that crime until 2001. While in prison, he did not receive sex-offender treatment. After he was released, he was ordered to participate in such treatment but was terminated from the treatment program without having completed it, at least in part because he was unable to pay the treatment provider's fee.

Mother and father met around 2009. Before they met, mother was married to another man, Benoit, with whom she lived in the State of Washington. Mother and Benoit had two children together. The first child, S, was born in Washington in 2007. When S was three months old, he was taken to a hospital because of respiratory distress. The hospital performed a bone scan on S and found "old fractures and breaks." The Washington Department of Social and Health Services took custody of S. A child protective services worker, Hopfauf, interviewed mother. Mother told Hopfauf that she had "a really bad temper" and that, about a month earlier, she and Benoit had argued about whether to put S up for adoption because they were unsure that they were able to adequately parent the child. During the argument, mother grabbed S by the ankle and held him upside down in the air until Benoit took the child from her. S had not been injured in that incident, but Hopfauf made a finding of physical abuse.

Washington's child protective services initiated dependency proceedings and referred mother to a number of programs and services, including parenting classes and anger-management classes, which mother did not complete. After the first hearing in the dependency proceedings, Benoit became abusive toward mother, forced her into their car, and drove to Oregon, eventually stopping in Medford. Mother never returned to Washington, and her parental rights to S were terminated by default.

While living in Medford, mother had her second child, J, in September 2008. DHS took protective custody of J at the hospital when he was three days old. According to mother, Benoit panicked the next day and they left Medford and moved to Crescent City, California. Two or three months later, mother left Benoit and went to Grants Pass. Shortly thereafter, she met father and they became romantically involved.

Father disclosed his sex-offender status to mother "right off the bat." He told her that he had engaged in sex-offender treatment, and she believed him. She felt that he was safe around children because of how much time had passed, how old he was at the time of the offenses, because "people can change," and because he had had treatment. Mother, in turn, told father about S and J having been removed from her care.

In connection with dependency proceedings involving J, mother was ordered to undergo a psychological evaluation and to follow any recommendations stemming from it. She was diagnosed with a personality disorder with dependent and borderline features. According to the psychologist who conducted the evaluation, O'Connell, mother perceived the events that led to her involvement with DHS as "largely the result of the behavior of others, primarily [Benoit], and did not seem to have much recognition into the role that she had in events that resulted in harm befalling her children." O'Connell also opined that mother's dependent personality meant that "one of the ways she copes with the challenges of life is to find someone that she perceives to be very strong, establish a strongly allied relationship with that person, and then do whatever is necessary in order to maintain that relationship." He stated that, because of her dependent personality, mother

"would likely find herself in situations where she has to choose between the welfare of her children [and] the continuation of her relationship.

"And there are times when one should depart from a relationship in order to keep one's children safe. That would be a difficult decision for her because her personality style suggests that she would place much higher priority on continuing her relationship."

O'Connell recommended that mother take parenting classes, anger-management classes, and individual psychotherapy. Mother did not follow those recommendations.

In May 2010, while the proceedings related to J were pending, mother gave birth to A, her first child with father. Before A was born, mother and father rented a residence, paying their rent with funds provided by the Temporary Assistance for Needy Families (TANF) program. (Mother and father have both been unemployed since their relationship began.) DHS took A into protective custody two days after she was born. Because A was removed from mother and father's care, they were no longer eligible for the TANF program and had to move because they could no longer pay the rent. They began camping on private property outside Grants Pass.

Approximately two months after A was born, a termination trial was held with respect to mother's parental rights to J. Her rights were terminated in September 2010.

After the dispositional hearing related to A, mother was ordered to have an updated psychological evaluation, and to follow any recommendations from the evaluator. Father was ordered to undergo a psychosexual evaluation and to follow any recommendations. Both parents were ordered to participate in a parenting program, and to maintain safe and stable housing. Both parents initially refused to sign releases authorizing the ordered evaluations, although they did sign releases of information for the parenting program in October 2010. DHS referred them to Family Friends, which provided a parenting program. Mother was accepted into the program, but father was denied because of his status as an untreated sex offender. Mother declined to participate on her own.

DHS allowed mother and father weekly supervised visits with A at the DHS office, which they attended regularly. In April 2011, a caseworker noticed that mother looked pregnant. Mother confirmed that she was indeed pregnant and told the caseworker that she was not going to give her any additional information other than that DHS "would not be getting that child." Mother and father stopped coming to their scheduled visits after that.

Around the same time, while parents were at their campsite, three men were shooting guns in the area. The men approached and told mother and father that they were on private property and had to leave. Parents moved their camp to a nearby location. Father testified that their new campsite was on private property, where he had permission to live, but he refused to disclose the property owner's name.

V was born on June 6, 2011. Shortly before she was born, mother and father decided to leave Oregon, at least in part to prevent DHS from taking custody of V. Father testified that he intended to go to New Orleans to seek construction work and did not intend to return. Mother echoed that testimony, stating that she and father intended to "look for work and for a place to stay" in New Orleans and to "get our life going, basically." Someone gave them a car to help them leave. They packed all of their belongings into the car and went to a motel in Grants Pass, where mother gave birth with the assistance of father, who had experience as an emergency medical technician, had been trained in childbirthing by a midwife, and had delivered his first child. The family left the motel the next morning and drove to California.

Somewhere in Humboldt County, the car broke down and parents called 9-1-1. The California Highway Patrol directed an ambulance to the scene, and parents and V were taken to a nearby hospital. Mother told the ambulance personnel that she had given birth to V in the car on the side of the road in Oregon. At the hospital, V was examined and given a clean bill of health. The hospital's registration clerk asked parents for their address, and they gave an address in Grants Pass.

DHS was alerted that mother had given birth and that parents and V were at the hospital in California. DHS requested that California Children's Protective Services place a hold on V, and a caseworker took custody of her at the hospital. The next day, the juvenile court in Josephine County issued a protective custody order. A California caseworker took V to Crescent City and delivered her to an Oregon DHS caseworker, who returned to Josephine County with her. Mother and father returned within the next few

days, set up camp in the same place they had just left, and resumed their visits with A at the DHS office.

DHS filed a jurisdictional petition on June 10, 2011. An amended petition alleged that V's conditions and circumstances endangered her welfare for the following reasons:

"[2] a) That said child's sibling had been physically abused in the state of Washington while in the care of the mother in 2007, which resulted in the child being placed out of the mother's care, which places the child at threat of harm.

"The State further alleges that aggravated circumstances exist pursuant to ORS 419B.340(5), as follows: That the mother has had her rights to another child terminated involuntarily.

"b) Further, despite prior services offered to the mother through Washington and Oregon DHS and other agencies, the mother has been unable and/or unwilling to overcome the impediments to her ability to provide safe, adequate care to the child, which resulted in other children being removed from her care.

"The State further alleges that aggravated circumstances exist pursuant to ORS 419B.340(5), as follows: That the mother has had her rights to another child terminated involuntarily.

"c) Further, the mother's residential instability, employment instability and chaotic lifestyle interfere with her ability to meet the child's basic needs.

"d) Further, the mother's mental health problems interfere with her ability to parent and protect the child.

"e) Further, the child's mother is aware of the nature of the allegations against the father and is unable or unwilling to protect the child from abuse and/or neglect, which places the child at a threat of harm.

"f) Further, the father * * * is a convicted and/or adjudicated sex offender. On 2/2/1994, in Josephine County, Oregon, he was convicted of Sodomy in the First Degree of a child under the age of twelve years. The father has not participated in the psycho-sexual evaluation previously court ordered in the dependency case for this child's sibling, which places the child at a threat of harm.

"The State further alleges that aggravated circumstances exist pursuant to ORS 419B.340(5), as follows: That the father * * * has subjected any child to rape, sodomy or sexual abuse.

"g)   Further, the father * * * was adjudicated October 25, 1984, for an act which, if committed by an adult, would constitute Rape in the First Degree of a 3 year old child. The father completed St. Mary's Sex Offender program during his commitment to OYA. After being released from OYA, however, the father sexually offended another minor. These conditions and circumstances present a threat of harm to the child.

"The State further alleges that aggravated circumstances exist pursuant to ORS 419B.340(5), as follows: That the father * * * has subjected any child to rape, sodomy or sexual abuse.

"h)   Further, the father['s] * * * residential instability, employment instability and chaotic lifestyle interfere with his ability to meet the child's basic needs.

"i)   Further, despite prior services offered to the father * * * through DHS and other agencies, the father has been unable and/or unwilling to overcome the impediments to his ability to provide safe, adequate care to the child, which resulted in another child being removed from his care.

"j)   Further, the child's father * * * is aware of the nature of the allegations against the mother and is unable or unwilling to protect the child from abuse and/or neglect, which places the child at a threat of harm."

DHS allowed parents supervised visits with V twice a week at the DHS office. For the first two months, parents' hostility toward DHS was manifest and appeared to affect V. The DHS worker who supervised their visits, Pollard, approached them and asked if they could set aside their feelings about DHS during the visits and focus on V's needs. According to Pollard, parents "started doing that from that point on and visits started going really well for [V] and her parents." Pollard gave them "some developmental handouts" and testified that they "were open to reading those" and that they "demonstrate[d] that they have read through them. They've made some changes in their parenting and lately it's been all positive." Pollard testified in November 2011

that, at that point, their parenting efforts were "remarkable. You can just see that they really want to parent their child." She added that parents "have consistently shown concern for their daughter, her general welfare concern, in that she's comfortable, that she feels close to them." Pollard also testified that she had no concerns about parents' interactions with each other, stating, "They've always appeared that they've really cared about one another and they sit close to one another, they cuddle each other. They appear to love one another." She also noted that they "equally shared" parenting responsibilities.

The juvenile court held a jurisdictional hearing over several days in November 2011 and April and May 2012. Among the witnesses were three psychologists. The first to testify was Robinson, who specializes in sex-offender treatment and was hired by DHS to assess the risk that father will commit sex offenses against his children. Robinson did not interview father, but conducted a Static-99R actuarial risk assessment, which is conducted solely using "archive data" from historical records. According to Robinson, the Static-99R is "the best tool that we have in this field" for determining the risk that a sex offender will reoffend. He reviewed juvenile records, investigative reports, adult probation and parole records, and other records related to father's criminal history. Based on the Static-99R assessment, Robinson concluded that father was a "low moderate" risk for reoffending.[1] According to Robinson, 15 years after the last sex offense, a person with father's score on the Static-99R has a 19 percent chance of reoffending. He stated that the risk actually increases with time until the offender reaches age 60.

The second psychologist to testify was Gordon, whom father had hired to conduct a "psychosexual risk evaluation." Gordon reviewed extensive records related to father's history. He also interviewed father and conducted a number of psychological tests, as well as a Static-99R assessment. Gordon diagnosed father with a personality disorder with histrionic, paranoid, and antisocial features.

---

[1] Robinson explained that, in conducting the Static-99R assessment, points are assigned for 10 factors. The total score falls within one of four ranges of risk for reoffending: low, low moderate, high moderate, and high.

Using the Static-99R, Gordon placed father in the "low, to low moderate range for risk" of reoffending. However, Gordon opined that, with respect to father's own children, the risk is low and sex-offender treatment is not necessary for their safety. He explained that bonding and attachment are relevant to the risk and that "people have very different levels of bonding and attachment to their own children than they do to even siblings or other relatives." He added that a sex offender presents a lower risk of offending against his or her own children if he or she has no history of such offenses.

The third psychologist was Jensen, a certified clinical therapist hired by DHS to review Gordon's evaluation. Jensen reviewed extensive records related to father's history as well as Gordon's report. Jensen took issue with Gordon's conclusions in part because Gordon had not performed a plethysmograph, which measures male arousal in response to visual and auditory materials depicting children and adults in various "normal" and "deviant" sexual "themes." According to Jensen, the plethysmograph is the "best researched measure" and the "number one predictor of reoffense."

Like Robinson and Gordon, Jensen also conducted a Static-99R assessment, but he scored father in the "moderate to high area." Jensen testified that the length of time that had passed since father's last offense did not eliminate the concern that he might reoffend. He acknowledged that "there's no question that the longer the period of time that goes by with no offenses the better." However, he stated that "sexual deviance doesn't go away. Sexual deviance is managed. It is treated. It is maintained under control. But it doesn't really go away. * * * And so, it's always a potential risk factor." He noted that, in his private practice, he was currently treating people who "offended when they were young adults, and then didn't offend until they were grandparents again." According to Jensen, father's failure to have completed sex-offender treatment was significant because treatment teaches offenders that "they have a lifelong problem" and that they must "avoid situations where they are unsupervised with minor children of the age group that they have molested." He added that "[u]ntreated sex offenders are much, much more likely to reoffend. There's an

extremely high risk of untreated sex offenders reoffending, if they place themselves in situations to have access to young children of the age they're attracted to." Jensen noted that Gordon's psychological assessment of father showed that "he's impulsive, he has numerous problems with handling things responsibly, he's immature, he has social relationship problems." Jensen stated, "These are all of the things we see in untreated sex offenders."

Jensen also disputed Gordon's conclusion that father is significantly less likely to offend against his own children. He acknowledged that being related to a child is "an inhibitor" for most people but stated that, for "sex offenders who have already broken boundaries, and broken severe boundaries, it's not a big step." He explained that sex offenders are "going to go for the easiest and most accessible victim. They're not going to go outside the home where someone's likely to report them if they have someone available inside the home," adding, "Having children in the home is the biggest risk there can possibly be for a person that molests children."

Mother and father also both testified at the hearing. On cross-examination, mother was asked about statements she had made in proceedings related to A concerning mother's priorities as between A and father:

> "[I]t's true, is it not, that during court proceedings you testified quite clearly that if you had the choice whether or not to choose [A] over the child's father, you would choose the child's father; isn't that correct?
>
> "A   All we know is we go by Christ, and Christ said do not split up a family. Therefore, there's my answer.
>
> "Q   And well actually, you didn't answer the question. Would you like me to repeat it again?
>
> "A   Family does not split, and [father] is family.
>
> "*****
>
> "Q   If given a choice whether or not to choose your child, to work toward getting back with your child, [A], and remaining with the Father, who did not complete services either, you told the Court that you would choose the child's father over [A]?

"A  Okay, let me put it this way; I will stay with [father] unless if I were to see something that would endanger my children would be the only time that I would leave him. Until then, he's innocent.

"Q  So you would have to, would you not, wait for something to happen, for this man to do something to your child, before you would take action; is that fair to say?

"A  To leave him, correct."

Later, mother was asked about her dependence on father:

"What does dependent mean to you?

"A  As a partnership, you're supposed to be able to rely on one another to help, to make decisions together, to do everything together.

"* * * * *

"* * * As far as being able to take care of your own self, okay, yeah, I can take care of myself. But it makes it a lot easier when you've got somebody to help.

"Q  Sure. And in fact, if [father] decides something, you just go along with it, isn't that right?

"A  No. I just told you, we talk about everything.

"Q  And when [father] is in a room with you, [father] is the one that does the talking; isn't that correct?

"A  Because he chooses to.

"* * * * *

"* * * I speak as well. Maybe not as much, but I do speak.

"Q  So, if [father] decided to leave tomorrow and leave both [A] and [V] behind, and go back to New Orleans, you would go with him, would you not?

"* * * * *

"A  Depends on circumstances.

"* * * * *

"* * * If he were to do something mean and very hurtful, then yeah, I probably would leave. But otherwise, there's services down there that we could do. There's ways to do it telephonically to still be able to see our kids. * * *

"Q   So, if [father] left tomorrow, just left the state to go somewhere else, Louisiana, Illinois, anywhere else, and [V] and [A] were left here in Oregon, you would go with [father]; would you not?

"A   Yes. Yes."

Several DHS caseworkers also testified at the hearing. Hill-Hicks, who was assigned to work with parents regarding A, testified about parents' living arrangements. She stated that, starting in June 2010, parents had a home "off Rogue River Highway" in the Grants Pass area, camped in different parks, lived in a home on Amelia Drive in Grants Pass, "and then camping after that." Hill-Hicks was asked what evidence DHS had to substantiate the allegation that parents have a chaotic lifestyle, lack of employment, and instability. She replied:

"I have not known either parent to have a job since I've been involved with the family. * * *

"* * * I've never been made aware of a specific dwelling that either parent has been living in since the start, since I've been involved.

"Q   Okay. And does that present concern to the agency from a safety standpoint? And if so, explain why.

"A   It does. It's best for a child to have a stable location to call home. Something that is—that would be free of safety threats to the child. A young child is going to be at some point mobile and exploring their environment, and without a stable, safe location, there's a lot of just natural threats that would be present to the child. It's difficult on a child to not, to be moving here and there, wherever, and that sort of thing."

On cross-examination, Hill-Hicks was asked whether camping in the same spot for roughly a year would constitute "fairly stable housing." She replied, "It could be." She was also asked whether a tent can be safe, and she again replied, "It can be." She acknowledged that she had never been to, nor asked to see, any of parents' residences. Hill-Hicks agreed that camping is not inherently unsafe and that having multiple residences and being unemployed are not by themselves reasons for DHS to remove children from their parents' care. She later explained that DHS made the "chaotic

lifestyle" finding based on the combination of multiple residences and unemployment "in addition to the history of residency throughout prior cases and prior involvement with the family. With the [case involving J], and [mother's] whereabouts were unknown for extended periods of time, as were her activities. And all of those pieces combined, lead to the chaotic lifestyle." She clarified that "the pattern of child welfare involvement" supported the "chaotic lifestyle" finding.

At the conclusion of the hearing, the juvenile court made oral findings and conclusions. The court found that parents' testimony regarding changing their state of residence was not credible. It found that they were leaving the state but that they had not formed a "completed opinion and decision" that they were going to move from Oregon permanently, which the court concluded is a requirement "if you're going to change your jurisdiction, or your state * * *."[2] Therefore, it found that their departure from Oregon was "no more than a temporary departure." The court also found that DHS had proved the allegations in the operative petition.[3] Accordingly, it entered a jurisdictional judgment declaring V to be a ward of the court.

---

[2] The court initially stated:

"My finding is I do not believe and do not find that the parents were changing their state of residence. I find them not credible.

"I find that they were merely leaving the state; certainly, they were doing that. I don't believe that changed the residence of the child. My conclusions are that it did not. So that, in addition to that would also make this no more than a temporary departure from the state as well."

The court later clarified its findings:

"[W]ith regard to the changing of their residence, to be a little more specific, I don't find that under the testimony that they were intending to move to a particular state, New Orleans, Illinois, wherever. And I believe there's a requirement that if you're going to change your jurisdiction, or your state, you have to have formed at least a completed opinion and decision as that you were going to move from that state."

We understand the court to have found that parents intended to leave Oregon only temporarily and to have concluded that, because they did not intend to move to a particular state, Oregon remained their legal residence. The court's statement about a "temporary departure" appears to have been a reference to ORS 109.704(7), which provides that, for purposes of determining a child's "home state," any "temporary absence" is deemed to be part of the period during which a child lived in a particular state.

[3] The operative petition included two allegations that Benoit was V's legal father and was unable or unwilling to protect and care for her. DHS moved to

In July 2012, the court held a dispositional hearing, at which DHS asked to be relieved of its duty to make efforts to reunify V with mother and father, based on parents' past failure to engage in services and their attempt to leave Oregon without regard for the risk that it would create for V or the effect that it would have on A. The court denied that request and ordered DHS to provide services to parents. It entered a dispositional judgment placing V in the legal and physical custody of DHS.

Mother and father appeal both judgments. In her first assignment of error, mother asserts that the trial court erred in determining that it had personal jurisdiction over child and subject matter jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). With respect to personal jurisdiction, mother contends that jurisdiction is not proper when a child was taken into custody in another state.

In support of her contention that the juvenile court lacked personal jurisdiction over child, mother cites *State ex rel Juv. Dept. v. Kennedy*, 66 Or App 89, 672 P2d 1233 (1983). In that case, California authorities took the child into custody at the request of Oregon's Children's Services Division, which had obtained a warrant for the child's custody. The child, who was born in Oregon but had lived in California with his parents for nearly two years, was brought to Oregon. We concluded that statutes governing temporary custody of children implied that personal jurisdiction over the child turned on whether he was present in Oregon when he was taken into custody.[4] We held that there was "no statutory provision establishing personal jurisdiction over a non-resident child who is not a ward of the court and is taken into custody outside the state," *id.* at 93, and that the "juvenile code does not provide for the establishment of personal jurisdiction over a child by the filing of a petition and the issuance of an arrest warrant for a non-resident

---

dismiss those allegations, and the court did not make findings with respect to them.

[4] We cited *former* ORS 419.569, ORS 419.573(1), and ORS 419.579. All three statutes were repealed in 1993, *see* Or Laws 1993, ch 33, § 373, and replaced, respectively, by ORS 419B.150, ORS 419B.157, and ORS 419B.168(2), the pertinent provisions of which are materially indistinguishable from the repealed statutes.

child in the lawful custody of his parents in California," *id.* at 94-95.

Relying on *Kennedy*, mother asserts that, in this case, because "child was not living in Oregon at the time she was taken into custody, there was no personal jurisdiction." We disagree because the statutory scheme has changed since we decided *Kennedy* in 1983. In 2001, the legislature enacted ORS 419B.803, which provides:

"(1)   A juvenile court having subject matter jurisdiction has jurisdiction over:

"(a)   A party, who has been served in the matter as provided in ORS 419B.812 to 419B.839 to the extent that prosecution of the action is not inconsistent with the Constitution of this state and the Constitution of the United States;

"(b)   *A child under 12 years of age who is the subject of a petition filed pursuant to ORS 419B.100*; and

"(c)   Any other party specified in ORS 419B.875(1).

"(2)   Juvenile court jurisdiction is subject to ORS 109.701 to 109.834."

(Emphasis added.) That statute confers personal jurisdiction over a child under age 12 who is the subject of a petition filed under ORS 419B.100, without regard to where the child is located. Here, V meets the qualifications of ORS 419B.803(1)(b), so, if the juvenile court had subject matter jurisdiction over that case (which we discuss below), it also had personal jurisdiction over V.

In all events, as noted, ORS 419B.803(2) provides that juvenile court jurisdiction is subject to ORS 109.701 to 109.834, the UCCJEA, which establishes a distinct system of determining jurisdiction over children. ORS 109.741 sets out the jurisdictional requirements of the act. Subsection (3) of the statute provides, "Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child custody determination." That statute was enacted in 1999. Or Laws 1999, ch 649, § 13. Its predecessor, *former* ORS 109.730 (1973), *repealed by* Or Laws 1999, ch 649, § 55, provided only that "[p]hysical presence of the child" was not a prerequisite for jurisdiction to

determine custody. In other words, it did not provide, as ORS 109.741(3) does, that personal jurisdiction over the child is not necessary to make a custody determination.[5]

The commentary to the UCCJEA is unequivocal about the effect of ORS 109.741(3): "[N]either minimum contacts nor service within the State"—the usual hallmarks of personal jurisdiction—"is required for the court to have jurisdiction to make a custody determination." Uniform Child Custody Jurisdiction and Enforcement Act § 201 Comment, 9 ULA 649, 673 (1999). Under ORS 109.741(3), then, personal jurisdiction over a child is not required for a court to have jurisdiction over a matter concerning the custody of the child, including dependency jurisdiction. *See Dept. of Human Services v. G. G.*, 234 Or App 652, 656, 229 P3d 621 (2010) ("The UCCJEA applies to dependency proceedings in Oregon.").[6]

In the end, the only issue presented is whether the requirements of ORS 109.741(1) are satisfied, regardless of whether the juvenile court had personal jurisdiction over V. ORS 109.741(1) provides:

"(1) Except as otherwise provided in ORS 109.751 [governing temporary emergency jurisdiction], a court of this state has jurisdiction to make an initial child custody determination only if:

"(a) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;

"(b) A court of another state does not have jurisdiction under subsection (1)(a) of this section, or a court of the home state of the child has declined to exercise jurisdiction

---

[5] We note that the parties in *Kennedy* did not call our attention to *former* ORS 109.730, or any other provision of the Uniform Child Custody Jurisdiction Act (the predecessor to the UCCJEA), in their briefing, and we appear not to have considered any part of that act in deciding that case.

[6] Mother does not argue that the statutory jurisdictional scheme violates constitutional due process principles. Nor does she raise any other due process or constitutional concerns. Accordingly, we do not consider whether this case presents any such issues, and our analysis is confined to whether the statutory jurisdictional requirements were met.

on the ground that this state is the more appropriate forum under ORS 109.761 or 109.764, and:

"(A)   The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and

"(B)   Substantial evidence is available in this state concerning the child's care, protection, training and personal relationships;

"(c)   All courts having jurisdiction under subsection (1)(a) or (b) of this section have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under ORS 109.761 or 109.764; or

"(d)   No court of any other state would have jurisdiction under the criteria specified in subsection (1)(a), (b) or (c) of this section."

Subsection (1)(a) provides that a court of this state has jurisdiction if Oregon is "the home state of the child" when the proceeding is commenced. "Home state" is defined by ORS 109.704(7), which provides, in part, "In the case of a child less than six months of age, 'home state' means the state in which the child lived from birth with [a parent or person acting as a parent]. Any temporary absence of any of the mentioned persons is part of the period." The question is whether V lived in Oregon "from birth," given that mother and father took her to California the day after she was born. The trial court found that parents did not intend to move away from Oregon, but merely left temporarily. In light of our standard of review, we are bound by that finding. It follows that Oregon is V's home state and that the jurisdictional requirement under ORS 109.741(1)(a) is met.

In short, under ORS 109.741(3), personal jurisdiction over V was not required for the juvenile court to make a custody determination. Even if it were required, ORS 419B.803(1)(b) confers personal jurisdiction under the facts of this case. Accordingly, we reject mother's first assignment of error.

In her second assignment of error, mother argues that the juvenile court erred in finding V within its jurisdiction

under ORS 419B.100. Father, who filed a separate appellate brief, also challenges the court's jurisdiction under ORS 419B.100.[7] We turn to that issue and consider parents' arguments together. Parents argue that there is insufficient evidence in the record to support the conclusion that there is a nexus between parents' respective conduct and conditions and a threat of serious loss or injury to V.

We begin with whether DHS proved that father's sex offenses exposed V to a risk of serious harm. Parents argue that DHS failed to demonstrate a nexus between father's offenses when he was a teenager and his ability to safely parent his own child. Parents acknowledge that Jensen testified, in essence, that a former child sex offender always presents a risk of harm to children, but they contend that our case law establishes that a parent's former criminal acts toward children are not enough to demonstrate a risk of harm to the parent's own child. In particular, parents rely on *Dept. of Human Services v. B. B.*, 248 Or App 715, 274 P3d 242, *adh'd to on recons*, 250 Or App 566, 281 P3d 653 (2012).

In that case, the father had sexually abused two young children when he was 11 or 12 years old and later sexually abused a three-year-old girl in his care in 1994, when he was 21 years old. *Id.* at 719-20. He was released on post-prison supervision and began sex-offender treatment in 1996. He admitted to viewing child pornography several times in 1998. *Id.* at 720. He discontinued his treatment in 1999 when his post-prison supervision ended. The parents had their first child in 1999 and later had three other children. *Id.* at 721. The family moved to another state

---

[7] Father also assigns error to the juvenile court's finding that DHS proved the aggravating circumstances alleged in the jurisdictional petition. Under ORS 419B.340(5), a finding of aggravation circumstances permits a juvenile court to order that DHS "is not required to make reasonable efforts to make it possible for the ward to safely return home[.]" In this case, although the court found aggravating circumstances based on father's sexual abuse of other children and the termination of mother's parental rights to her oldest children, it nonetheless ordered DHS to make reasonable efforts toward reunifying V with parents. On appeal, father argues that an "aggravated circumstances" determination interferes with the parents' constitutional rights to substantive and procedural due process. We reject that argument without extended discussion for two reasons. First, it appears to be unpreserved. Second, given that the trial court declined to relieve DHS of its obligation to make reasonable efforts toward reunification, any error associated with the "aggravated circumstances" determination has no practical effect and is, therefore, harmless.

later that year, and then moved back to Oregon in 2010. *Id*. at 722. Soon thereafter, DHS filed petitions alleging that jurisdiction was warranted because the "father 'has a history of inappropriate sexual contact with minors and such behavior un-remediated endangers the child's welfare and safety.'" *Id*. DHS also alleged that the children were endangered because the father "had 'disclosed inappropriate sexual contact with minors and failed to complete the sex offender treatment as recommended by child welfare authorities.'" *Id*. The juvenile court found that DHS had proved both allegations.

We conducted *de novo* review, and we reversed because we were not persuaded that the evidence demonstrated a current risk of serious harm to the children. We concluded that the juvenile court's finding that the father's sexual-offender conduct was unremediated was the determinative fact that—if supported by the record—would support the conclusion that his children were in danger. *Id*. at 723. We went on to conclude, however, that the evidence did not support a finding that the father's condition was unremediated. We based that decision in part on the fact that no evidence suggested that the father had had sexual contact with any children since 1994. Significantly, however, we also focused on the lack of *expert* testimony establishing that father was at risk of reoffending. The juvenile court had stated that the only evidence regarding the risk that the father posed to the children was "'the information from the treatment provider' that 'as time goes on, the longer you're away from treatment, the greater the risk [of sexually inappropriate behavior] actually becomes.'" *Id*. at 723-24 (brackets in *B. B.*). We noted that the trial court had misunderstood the evidence, as the only treatment provider who had testified actually had stated that sex-offender treatment was not required for the father to be "in remission." *Id*. at 724. Rather, his testimony indicated that the father "could have made changes in his life during the 11 years following [his] last treatment *** so as not to 'recommit these types of offenses.'" *Id*. at 725. The only admissible evidence concerning the connection between sex-offender treatment and the likelihood of reoffending was the treatment provider's testimony that "the prevailing trend in

the treatment community was that 'therapy would increase the likelihood for remission and reduce the likelihood for recidivism[.]'" *Id.* at 724. We found, on *de novo* review, that that evidence did not satisfy DHS's burden of proof. *Id.* at 726.

We also concluded, with respect to the second allegation, that, on the record before us, the father's failure to complete sex-offender treatment did not establish a current risk of abuse. *Id.* at 727. We held that "there is no presumption that father's failure to complete treatment some 11 years before the jurisdictional hearing, by itself, makes father 'an unremediated sex offender,' who in turn would be presumed dangerous to his children." *Id.*

Parents argue that, under *B. B.*, DHS was required in this case to prove that father had not ameliorated the condition that caused him to commit sex offenses in the 1980s and, consequently, that his status as a sex offender currently endangered V. Parents acknowledge Jensen's testimony that father was at "moderate to high" risk for reoffending, but they ask that we review *de novo* the testimony of all three psychologists and give greater weight to Gordon's and Robinson's conclusions.

Parents place more weight on *B. B.* than it will bear. Our opinion in that case was premised entirely on our *de novo* review of the facts. Indeed, the court emphasized that standard of review when it explained its disagreement with what it characterized as the dissent's argument "that we should affirm the juvenile court because it was entitled to draw different inferences and DHS had established evidence from which a reasonable factfinder could conclude that father was a danger to his children." *Id.* at 728 n 2. The court explained that, "[e]ven assuming * * * that the juvenile court could have drawn the inference that father is a current risk to his children's safety, we review this case *de novo*, and not under the standard of review the dissent applies." *Id.* Here, unlike in *B. B.*, we have declined to conduct *de novo* review. Accordingly—and again unlike in *B. B.*—we review the evidentiary record to determine whether any evidence, and the inferences that reasonably can be drawn from the evidence, supports the juvenile court's findings. Applying

that standard of review, we are bound by the juvenile court's implicit finding that psychological evidence was persuasive.[8]

Part of that evidence is Jensen's testimony, which itself is sufficient to support the court's finding that father's earlier offenses placed V at risk of serious harm. In addition to testifying that sexual deviance "doesn't go away," Jensen also stated that "[u]ntreated sex offenders are much, much more likely to reoffend. There's an extremely high risk of untreated sex offenders reoffending, if they place themselves in situations to have access to young children of the age they're attracted to." The juvenile court was not presented with any evidence that father could have remediated his condition as a sex offender by means other than treatment. Furthermore, unlike any expert evidence in *B. B.*, Jensen's conclusion was based on a current assessment of father's risk. Jensen based that conclusion in part on the Static-99R assessment that he had conducted, but also on Gordon's report, including the psychological assessments that Gordon had performed in 2012. Jensen noted that father's impulsiveness, immaturity, and problems with social relationships and with "handling things responsibly" are all traits seen in untreated sex offenders, suggesting that, in fact, father has not remediated his condition.

In any event, even Gordon and Robinson testified that father's score on the Static-99R assessment showed a low or "low moderate" risk that he would reoffend. Robinson stated that father's score equated to a 19 percent chance of reoffending 15 years after the last offense and, indeed, that the likelihood of a new offense increases with time until the offender reaches age 60. Even if the trial court had given Robinson's testimony more weight than Jensen's, we would still conclude that a 19 percent chance (or more, given that 23 years had passed since father's last offense) of father reoffending was a sufficient risk to support a finding that his condition places V at risk of serious harm.

---

[8] We conducted *de novo* review in *B. B.* because "the trial court's most important factual findings either plainly [did] not comport with uncontroverted evidence in the record or [were] inconsistent with other express factual findings." 248 Or App at 718. In this case, the court's findings concerning the risk of father reoffending are consistent and are supported by evidence, so *de novo* review is not warranted.

Parents next argue that DHS did not prove that their failure to engage in services exposed V to a risk of serious harm. With respect to mother, they argue that she participated in a psychological evaluation in 2009, as ordered, and has satisfied many of the conditions for change that O'Connell recommended in the evaluation, noting that she left her abusive relationship with Benoit and has "behaved quite differently in relationship to her younger children."

Mother's participation in psychological or psychosexual evaluations, and her subsequent changes, do not undermine the juvenile court's determination that—given the totality of the circumstances—she has not *adequately* addressed the circumstances and conditions that resulted in her being offered (or ordered to participate in) services. O'Connell, the psychologist who evaluated mother, recommended that she participate in anger-management classes and individual psychotherapy. She has not done so. Parents cite changes in mother's behavior, but those changes alone do not demonstrate that the underlying concerns about mother's psychological condition have been addressed. Mother's dependent personality continues to present legitimate concerns about her ability to care for V. Notably, mother testified that, if father left Oregon, she would go with him even if it meant leaving A and V behind. That evidence is sufficient to support the finding that mother's failure to engage in services leaves her unable to provide safe and adequate care for V.

Our conclusion is the same with respect to father. Father, too, was ordered to participate in parenting classes. At the time of the jurisdictional hearing, he had not done so. On appeal, father contends that, by the time of the dispositional hearing, he (along with mother) had enrolled in an appropriate parenting class. That assertion is inapposite. Our task is to determine whether the juvenile court erred in determining that V was within its jurisdiction. We do not consider events that occurred after the court made its determination. Other than pointing out his *subsequent* engagement in services, father does not present any reason why we should reverse the juvenile court's finding that DHS

had proved allegation (2)(i). Accordingly, we do not disturb that finding.

We turn next to parents' argument that DHS failed to prove that father was unable or unwilling to protect V from abuse or neglect by mother. Parents contend that, although father admitted that he was aware that mother's parental rights to her two older children had been terminated, "he also understood that the underlying reason those children were removed was that [Benoit] had been physically abusive" toward S, the oldest child. They assert that, because mother was no longer involved with Benoit, he no longer presented a risk of harm to mother or her children, and, consequently, DHS failed to demonstrate that mother's condition or conduct endanger V or that father is unwilling or unable to protect V from mother.

We disagree. Parents' assertion that mother's prior neglect consisted only of failing to protect her older children from Benoit illustrates parents' failure to recognize the full extent of the problems that mother's psychological conditions present. Mother was found to have abused S herself, albeit without causing him injury. Mother could have participated in parenting classes as early as October 2010, thereby taking a first step to overcoming the impediments to her ability to safely parent her children. She refused to do so because father could not participate in the same class. Father evidently was either unwilling or unable to persuade her to attend without him. That fact supports the juvenile court's finding that father is unable or unwilling to protect V from the threat posed by mother's conditions.

Parents next challenge the juvenile court's findings that their "residential instability, employment instability and chaotic lifestyle" interfered with their ability to meet V's basic needs. In their view, DHS offered no evidence that their lifestyle was chaotic and failed to demonstrate how those conditions interfered with their ability to meet V's basic needs. In response, DHS points to the evidence that parents lived in a tent, stayed at multiple locations, and had no means of support or employment and that the agency

had not been able to assess whether parents' home was safe for V because parents refused to disclose where they lived.

We agree with parents that the record does not support a finding that their living conditions, unemployment, or lifestyle created a risk of harm to V. DHS acknowledges that homelessness and unemployment are not, alone, sufficient bases for jurisdiction, and it offers no explanation of how the family's living conditions would put V's safety at risk. Nor have we found any evidence in the record that suggests such a risk. It follows that the juvenile court erred in finding that DHS had proved allegations (2)(c) and (h).

We turn to parents' contention that the totality of the circumstances do not support the conclusion that V is within the juvenile court's jurisdiction. Whether the proven allegations in the petition provide a basis for juvenile court jurisdiction is a question of law. *Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010). We readily conclude that, even without the allegations concerning parents' residential and employment instability and chaotic lifestyle, the remaining allegations in the petition support jurisdiction. Accordingly, we affirm the trial court's ultimate conclusion that V is within its jurisdiction. However, the findings in the jurisdictional judgment provide the framework for the juvenile court's analysis of DHS's efforts and the parents' progress toward reunification in permanency hearings. *Dept. of Human Services v. N. T.*, 247 Or App 706, 715, 271 P3d 143 (2012). Consequently, we must remand the jurisdictional judgment so the juvenile court can enter a new jurisdictional judgment omitting the findings that DHS proved allegations (2)(c) and (h).

Remanded with instructions to enter a new jurisdictional judgment omitting the findings that DHS proved allegations 2(c) and (h); otherwise affirmed.