Argued and submitted June 4, reversed and remanded September 25, 2013, petition for review allowed January 30, 2014 (354 Or 735)

In the Matter of N. S., aka N. D. S.-T.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*

S. D.-V.,
*Respondent,*

*v.*

A. R. S.;
and N. S., aka N. D. S.-T.,
*Appellants.*

Washington County Circuit Court
J070280;
Petition Number 02J070280;
A153447

310 P3d 1186

Shannon Storey, Senior Deputy Public Defender, argued the cause for appellant A. R. S. With her on the briefs was

Peter Gartlan, Chief Defender, Office of Public Defense Services.

Megan L. Jacquot argued the cause and filed the brief for appellant N. S.

Cecil A. Reniche-Smith, Senior Assistant Attorney General, argued the cause for respondent Department of Human Services. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Erin Galli argued the cause and filed the brief for respondent S. D.-V.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

ORTEGA, P. J.

**ORTEGA, P. J.**

This is the third time that we have considered an appeal in this juvenile dependency case. In the first appeal, we reversed and remanded a permanency judgment because the juvenile court had analyzed mother's progress to allow child to return to her care under an incorrect legal standard—that is, the court incorrectly determined that a parent's ability to parent independently is a legal requirement for parental fitness. *Dept. of Human Services v. A. R. S.*, 249 Or App 603, 605-06, 278 P3d 91 (2012) (*ARS I*). In the second appeal, we reversed and remanded another permanency judgment because the court had relied on a circumstance that was not alleged or established as a basis for jurisdiction in assessing mother's progress toward reunification—*i.e.*, mother's purported personality disorder. *Dept. of Human Services v. A. R. S.*, 256 Or App 653, 664, 303 P3d 963 (2013) (*ARS II*). While that appeal was pending, the court held a review hearing at which it addressed motions by mother and child to dismiss the wardship. The court declined to dismiss the wardship and entered a review hearing judgment that continued the permanency plan of reunification. Mother and child (collectively, appellants) separately appeal that ruling.

Appellants challenge the court's refusal to dismiss the wardship and certain determinations in the court's review hearing judgment. In their first assignment of error, appellants assert that the juvenile court should have dismissed the wardship because the facts that gave rise to jurisdiction have been ameliorated. In their second assignment of error, appellants claim that the court, in its review judgment, erroneously determined that mother had not made sufficient progress to allow child to return to her care within a reasonable time. In their third assignment of error, appellants contend that the court erred in overruling the child's objection, based on the Fourteenth Amendment to the United States Constitution, to being "removed" from the United States to live with his father in Mexico. Child also raises additional assignments of error. Those are that the juvenile court erred when it determined that the Department of Human Services (DHS) had made reasonable efforts to reunify the family and that the court erred when

it determined that it was in child's best interests to continue the wardship. DHS and father respond that the juvenile court properly denied appellants' motions to dismiss jurisdiction and that several of appellants' other assignments of error should not be considered in this appeal. Because we conclude that the court erred by denying appellants' motions to dismiss the wardship, we address only appellants' first assignment of error. Therefore, we reverse and remand with instructions to dismiss the wardship.

As an initial matter, we decline child's request for *de novo* review. Child does not provide any reason why this case merits *de novo* review, and we do not perceive any reason for it. *See* ORAP 5.45(8)(c) (stating that we exercise *de novo* review only in "exceptional" cases). Accordingly, we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome. *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). We describe the facts in accordance with that standard.

Although the history of this case is extensive, we provide only the background necessary to address the issues before us. At the time of the review hearing, child, age five, continued to live in the foster home of his maternal grandmother with his two half-siblings, both of whom were adopted by grandmother when mother's parental rights to them were terminated several years ago. Father, after a visit to his home by immigration officials, left the United States to return to Mexico in late 2010 and remains there.

DHS first became involved in the family's life in 2007. As we explained in *ARS II*:

"DHS first filed a dependency petition with respect to child on July 24, 2007, four days after his birth. In a shelter/ preliminary hearing order, the juvenile court granted DHS temporary custody of child and approved placement of child with mother in child's maternal grandmother's (foster mother) home. Jurisdiction was established in September 2007; as to mother, it was based on mother's substance abuse problem, exposure of child to controlled substances while

pregnant, and relinquishment of parental rights to her two older children. Jurisdiction as to father was based on his substance abuse, his status as legal father, and because his parenting capacity was 'unknown.' Child remained placed with mother in foster mother's home. In October 2008, the juvenile court ruled that mother had made sufficient progress to ensure child's safe return to her and terminated its wardship of child. A year later, however, after mother left child with foster mother for five days without telling her when she would return, foster mother called DHS, and DHS again took protective custody of child. In October 2009, DHS filed a new dependency petition. The juvenile court entered new jurisdictional judgments over child in November 2009 (relating to father) and February 2010 (relating to mother). Child has lived with foster mother ever since.

"As it relates to mother, the court established dependency jurisdiction over child based on the following facts:

"'A. The mother has had residential instability since July of 2009, which impairs her ability to provide for said child.

"'B. The mother has a history of substance abuse, which if left untreated impairs her ability to care for said child. She provided a UA on October 8, 2009 that failed to register on the temperature test strip and tested positive for amphetamines/methamphetamines on a subsequent UA on the same date.

"'C. The mother has a history of leaving said child in the care of her mother without making appropriate plans for said child's ongoing care and supervision. This occurred frequently during September of 2009 and from October 2nd to October 7th, 2009. The mother knew that said child was safe with her mother.

"'D. Said child had a head injury in approximately September of 2009 which required stapling. The mother did not return said child to the doctor to have the staples removed. The late removal did not permanently adversely effect said child.

"'E. The mother had chosen violent and/or unsafe partners, which places said child at risk of harm. The mother's current husband is incarcerated until February of 2011 for Methamphetamine related crimes.

"'F. The mother voluntarily relinquished her parental right to two (2) other children.'"

256 Or App at 656-59 (footnotes omitted).[1]

After a permanency hearing in June 2011, the court determined that mother had not made sufficient progress toward reunification to enable child to be returned to her, *see* ORS 419B.476(2), but that father had made sufficient progress and, therefore, that the permanency plan would remain reunification and child would be returned to father's care by September 2011 if father completed certain conditions.[2] On appeal of the resulting permanency judgment, we reversed and remanded, concluding that

> "the juvenile court was * * * operating under a misapprehension that mother must be able to parent child independently— that is, without the assistance of child's maternal grandmother, who was child's foster placement and with whom mother (with grandmother's approval and encouragement) wanted to live—in order to demonstrate sufficient progress under the statute."

*ARS I*, 249 Or App at 605. Because a parent's ability to parent independently is not a legal requirement for parental fitness, we concluded that the juvenile court committed legal error. Accordingly, we reversed and remanded the case for the juvenile court to reconsider in light of the correct legal principles. *Id.* at 605-06.

Another permanency hearing occurred in the late spring and early summer of 2012. At the conclusion of that hearing, the court denied motions by appellants to dismiss jurisdiction, determined that mother had not made sufficient progress toward reunification with child, but that father had, and again ordered placement of child with father.[3] Appellants appealed that permanency judgment, and we again reversed and remanded, concluding that the court

---

[1] The juvenile court took jurisdiction of child as to father in November 2009 based on father's admission that he needed DHS's assistance to establish a relationship with child. Apparently, he had not had contact with child between child's birth and the juvenile proceedings that began in 2009.

[2] Mother's motion for a stay of the July 2011 permanency judgment pending appeal was granted by the Appellate Commissioner.

[3] We granted mother's stay request pending appeal; thus, the permanency judgment was stayed, and ultimately reversed in *ARS II*.

had erroneously relied on mother's purported personality disorder—a circumstance that was not alleged or established as a basis for jurisdiction—in assessing mother's progress toward reunification and denying her motion to dismiss jurisdiction. *ARS II*, 256 Or App at 661. Noting that a juvenile court cannot continue wardship over a child based on circumstances that were not explicitly stated or fairly implied by the jurisdictional judgment, we reversed the permanency judgment and remanded for the court to reconsider. *Id.*

On December 14, 2012, during the pendency of the appeal in *ARS II*, the court held a review hearing, *see* ORS 419B.449 (providing the court with authority to hold a hearing to review the child's condition and circumstances and to determine if jurisdiction should be continued). At that hearing, child moved to dismiss jurisdiction and objected to "removing" him from the United States. Mother also moved to dismiss jurisdiction and terminate the wardship, arguing that the conditions that had given rise to jurisdiction no longer posed a current threat of serious loss or injury to child. In her motion, she explained that she had completed inpatient and outpatient substance abuse treatment and had not used alcohol or controlled substances in 33 months. She explained that she was attending community college and living off of grants and financial aid. As for her living arrangements, she noted that she was living in a home with a roommate; however, she maintained that she would like to live in the "family home" but for the court's order prohibiting her from living with grandmother and child. Further, she noted that the court had no authority to continue jurisdiction based on mother's purported personality disorder or any other fact extrinsic to the jurisdictional judgment. In addition to requesting dismissal of the wardship, mother also asked for alternative relief, specifically, that the court lift the order disallowing mother from residing in the family home, sustain child's objection to being "removed" from the United States, and rule that DHS's reunification efforts had not been reasonable.

At the review hearing, DHS acknowledged some positive changes in mother's dealings with the agency, but

cautioned that mother had not alleviated at least two bases for jurisdiction—her residential instability and her choice of unsafe partners.

Up until a month before the review hearing, mother had lived with a boyfriend, Antonio, in Vancouver, Washington. While living with Antonio, mother had asked that DHS approve overnight visits with child, which required a home study pursuant to the Interstate Compact for the Placement of Children (ICPC). A basic criminal background check on Antonio did not return any concerning information. In early October, mother reaffirmed her request for an ICPC home study, but before that could happen, mother informed her caseworker that she had moved out because of Antonio's concerning behavior. After leaving Antonio's home, mother's living arrangements were unstable for a few weeks until she rented a room in a friend's home in Lake Oswego. At the time of the hearing, she was living there, but she indicated to DHS that she was planning to find a different place to live in January 2013 that was closer to where child was living. When DHS visited mother's residence in Lake Oswego, mother showed the caseworker a room that had nothing in it except boxes that the previous roommate had left. The caseworker indicated that the home was "safe and appropriate" and approved unsupervised daytime visits, but DHS declined to approve overnight visits until mother had made suitable sleeping arrangements for both her and child because her room lacked a bed for child. Mother indicated that grandmother would help her transfer a bed for child.

As for Antonio's concerning behavior, mother informed DHS via e-mail that he had threatened to harm himself if mother left him and that, as a result, she had moved out and ended the relationship. In addition, mother was concerned about Antonio's parenting style (as to his own child) and "his inability to put his child's needs before his wants." In that e-mail, mother indicated that she did not wish to expose child to an unstable person and that she would no longer allow Antonio around herself and her family. Mother indicated that she had "realize[d] that being in any type of relationship is not in my best interest" and that she had "housing for the meantime and will be renting a room soon."

The CASA report indicated that mother was attending community college classes, financed through grants and loans, to become a drug and alcohol counselor. Further, mother had begun court-ordered counseling every other week and spent much of her free time at grandmother's house, studying, preparing meals, and watching the children when grandmother was at work. The CASA ultimately recommended that child remain a ward of the court, but that mother could eventually be a permanent resource for child.

DHS, at the review hearing, also asserted that it had been difficult to assess mother's compliance with recommendations and court-ordered services because mother had failed to provide documentation that she was attending narcotics anonymous meetings and, further, that mother had only attended one counseling session in the six months since the last hearing and had only recently signed a release allowing DHS access to counseling records.

At the hearing, grandmother testified that her relationship with mother was no longer as tumultuous as it had been in the past, stating:

> "I think * * * with any mother-child relationship, there's not going to be a hundred percent agreement across the board on anything. But, I'll take the 75 to 80 percent that I'm getting now, because it's a heck of a lot better than it was, like I say, even two years ago."

She also noted that child was doing extremely well and has an incredible relationship with his half-siblings.

At the conclusion of the hearing, the court announced:

> "Mom is making insufficient progress towards reunification, and I find that the reasons for jurisdiction originally persist through today. There is no confirmation, really, of Mom's participation in counseling, and—and while I would conclude, I suppose, that even if Mom were participating in that counseling, that that counseling has begun really in the last 30 days, meaningfully.
>
> "Mom signed a Release just today to have DHS have access to those records, even though those requirements have been pending for the past six months. Mom continues to express residential instability, independence financially—and, by

the comment of her partner, there is evidence that suggests that she's unable to assess safety risk, which was the original reason for DHS for involvement.

"Now, having said that, do I conclude that that comment alone justifies, by itself, continuing DHS involvement and continuing wardship? No. But I will say the constellation of those factors that I just described in total, given the circumstances of this case, cause the Court to conclude that continuing DHS involvement and wardship of that placement is necessary.

"Stated more—more simply, I suppose, if you take the fact that [child] has been in care for 38 consecutive months, and the reasons that the Court originally became involved persist in some fashion today, that alone would be enough for the Court to continue jurisdiction.

"I acknowledge that the safety threats currently are not as extreme as those that caused the Court originally to be involved. But, after the passage of 38 consecutive months, one would expect that there would be some progress made towards addressing those safety issues. And there has not at least been sufficient progress to convince the Court that it's no longer necessary to be involved."

Thus, the court denied the motions to dismiss wardship, concluding that at least some of the jurisdictional bases had not been ameliorated and those that persisted continued to pose a risk of harm to child. The court entered a review judgment that continued the wardship, concluded that father had made sufficient progress, and continued the plan of reunification. The court also determined that mother had not made sufficient progress towards meeting the expectations set forth "in the service agreement, letter of expectation, and/or case plan" and that child could not be safely returned to her at that time.

ORS 419B.100(1)(c) grants a juvenile court jurisdiction over a child "[w]hose condition or circumstances are such as to endanger the welfare of the person or of others[.]" Whether the "conditions or circumstances" warrant jurisdiction requires us to consider if, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child. *State v. A. L. M.*, 232 Or App 13, 15, 220 P3d 449 (2009). For the court to maintain jurisdiction,

the jurisdictional bases—*i.e.*, the conditions or circumstances—must continue to pose a current threat of serious loss or injury, and there must be a reasonable likelihood that the threat will be realized. *Dept. of Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011). Put another way, the conditions or circumstances must present a threat of danger—*i.e.*, serious loss or injury—that is current and not speculative. *Id.*

Where, as here, the court's continued jurisdiction is at issue in a review hearing, ORS 419B.449(1) states that the court may "review the child or ward's condition and circumstances and * * * determine if the court should continue jurisdiction and wardship or order modifications in the care, placement and supervision of the child or ward." Accordingly, at such a review hearing the juvenile court examines whether the conditions or circumstances of the child require the court to retain jurisdiction. *Dept. of Human Services v. D. M.*, 248 Or App 683, 685, 275 P3d 971 (2012). "'A wardship cannot continue if the jurisdictional facts on which it is based have ceased to exist. However, that determination [at a review hearing] does not include a retrial of the original allegations. The evidence is limited to whether the conditions that were originally found to endanger a child persist.'" *Id.* (quoting *State ex rel Juv. Dept. v. Gates*, 96 Or App 365, 372, 774 P2d 484, *rev den*, 308 Or 315 (1989)).

The standards that govern our review of the juvenile court's resolution of that question are the same as the standards that govern our review of a juvenile court's original jurisdictional determination. Thus,

"we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome. Specifically, with respect to a juvenile court's determination under ORS 419B.100(1)(c), we: (1) assume the correctness of the juvenile court's explicit findings of historical fact if these findings are supported by any evidence in the record; (2) further assume that, if the juvenile court did not explicitly resolve a disputed issue of material fact and it could have reached the disposition that it reached only if it resolved that issue in one way, the court

implicitly resolved the issue consistently with that disposition; and (3) assess whether the combination of (1) and (2), along with nonspeculative inferences, was legally sufficient to permit the trial court to determine that ORS 419B.100(1)(c) was satisfied."

*N. P.*, 257 Or App at 639.

Before we review the court's determination in this case under that standard, we address the parties' disagreement over which party bore the "burden" in this case. Mother maintains that the proponent of continuing jurisdiction— in this case, DHS—had the burden to prove, by a preponderance of the evidence, that the factual bases for jurisdiction persisted. DHS disagrees, arguing that mother, as the moving party, bore the burden of demonstrating that the jurisdictional facts upon which the wardship was based had "ceased to exist."

We agree with mother. In the context presented by this case, DHS had the burden to prove, by a preponderance of the evidence, that the factual bases for jurisdiction persisted to a degree that they posed a current threat of serious loss or injury that is reasonably likely to be realized. In *D. M.*, when addressing a motion to dismiss jurisdiction at a review hearing, we adopted the mother's statement that a "wardship must be dismissed unless DHS proves that the alleged jurisdictional bases continue to pose a current threat of serious loss or injury" and concluded that DHS had failed to meet that standard in that case. 248 Or App at 686; *see also A. L. M.*, 232 Or App at 15 (dismissing the wardship because no evidence was presented at a review hearing that the conditions or circumstances that existed at the time of the hearing presented a reasonable likelihood of harm to the child).

Moreover, the statutory scheme supports placing the burden on DHS. As we have explained, ORS 419B.449(1) can put at issue the court's continuing jurisdiction. The statute also provides that "[t]he court shall conduct a hearing provided in subsection (1) of this section in the manner provided in ORS 419B.310, except that the court may receive testimony and reports as provided in ORS 419B.325." ORS 419B.449(2). ORS 419B.310(3), in turn, provides that "[t]he

facts alleged in the petition showing the child to be within the jurisdiction of the court as provided in ORS 419B.100(1), unless admitted, must be established by a preponderance of competent evidence." Viewing those statutes together, ORS 419B.449 places the court's continuing jurisdiction at issue; ORS 419B.100(1)(c) provides the legal standard for the court's continuing jurisdiction; and ORS 419B.310(3) requires the proponent of jurisdiction to prove, by a preponderance of the evidence, the facts that demonstrate that continuing jurisdiction is necessary.

Nevertheless, as we recently noted in *D. M.*, a motion to dismiss wardship that is considered at a review hearing does not require a "retrial of the original allegations. The evidence is limited to whether the conditions that were originally found to endanger a child persist." 248 Or App at 685. Accordingly, in this procedural context, DHS must prove by a preponderance of the evidence that those conditions persist and pose a reasonable likelihood of harm to child. *See* ORS 419B.449(3)(A) (requiring the court to state why continued *substitute care is necessary when the court decides* to continue the child or ward in substitute care).

The parties do not dispute that, of the original jurisdictional bases, the only two that remained at issue at the time of the review hearing were residential instability and mother's choice of unsafe partners. DHS does not dispute that mother's substance abuse has been ameliorated—there is no evidence that mother has used controlled substances in the 33 months preceding the review hearing.

Viewing the evidence of mother's residential instability and her choice of partners in the light most favorable to the court's disposition and giving credit to any permissible inferences, we conclude that the record contains insufficient evidence from which a reasonable factfinder could conclude, by a preponderance of the evidence, that those circumstances individually, or in combination, exposed child to a current risk of serious loss or injury that was reasonably likely to occur.

First, residential instability is not a sufficient basis for jurisdiction without a showing that it creates a risk of harm to the child. *See, e.g., Dept. of Human Services v. M. H.*,

256 Or App 306, 331, 300 P3d 1262, *rev den*, 354 Or 61 (2013) (evidence that the parents had multiple residences, including camping for extended periods of time, was insufficient to prove a risk of harm to the child). That is ultimately where the evidence fails in this case. Although there is evidence that mother lived in multiple residences in the year preceding the review hearing and that she was considering a move from her housing at the time of the hearing to be closer to child, or if allowed by the court, into grandmother's home, there is not sufficient evidence that those circumstances posed a current risk of harm to child that was not speculative. Mother was living in a room that was deemed safe and appropriate by DHS. There was no evidence that any condition or circumstance involving that home posed a risk of harm to child, and DHS offered no explanation as to why that home was a safety risk. Furthermore, there was no evidence that mother's purported plan to move closer to child would pose a safety risk. Any conclusion to the contrary is only speculation. Accordingly, the evidence of residential instability is insufficient to support a determination that it created a risk of harm to child.

Mother's relationship with Antonio suffers from the same flaw—that is, there is insufficient evidence for a reasonable factfinder to conclude that child was at a current risk of serious loss or injury that was reasonably likely to occur. We acknowledge the concern that mother became involved with a man who later threatened violence to himself—perhaps as a way to control mother. But the evidence here is that mother reacted appropriately to the threat, *i.e.*, she immediately left the home and ended the relationship, and contacted DHS. Given that there was no evidence that Antonio had a history of violence or that mother should, for some other reason, have forseen that he otherwise presented a safety risk, and further that mother ended the relationship and immediately left the home, any conclusion that child was at risk because of mother's choice of Antonio is speculative. It may be that, in some cases, where there is evidence that a parent has a pattern of choosing violent partners, it would be fair to infer that the parent's choice of yet another violent partner created a risk of harm to child. However, the record here does not establish that

mother had such a pattern (although she has historically chosen drug users as partners); thus, the record does not support the determination that mother's relationship with Antonio created a risk of harm to child.

In sum, although there is evidence of residential instability and that mother resided with one unsafe partner, there is insufficient evidence in the record from which a reasonable factfinder could conclude, by a preponderance of the evidence, that the totality of those circumstances exposed child to a current risk of serious loss or injury that was reasonably likely to occur. Any risk of harm on this record was speculative. Accordingly, the juvenile court erred in denying appellants' motions to dismiss the wardship.

Reversed and remanded.